## THE EMANUEL STAVROUDIS.

District Court, D. Maryland. June 29, 1927.

No. 1496.

1. **Salvage** ⬤⟹15—**Removal of steamship from pier by tugs, to escape danger from burning vessel, held authorized by those in charge.**

Removal of a steamship by tugs from her pier, on the opposite side of which a vessel was burning, *held* authorized, or at least acquiesced in and accepted, by those in charge, so as to make steamship liable for salvage service.

2. **Salvage** ⬤⟹24—**Salvage is reward allowed by maritime law for voluntary service rendered to relieve vessel from distress or danger present or to be reasonably apprehended; "salvage service."**

A "salvage service" is a service voluntarily rendered to a vessel in need of assistance, and is designed to relieve her from distress or danger, either present or to be reasonably apprehended and for which a salvage reward is allowed by the maritime law.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Salvage Service.]

3. **Salvage** ⬤⟹13—**"Salvage service," though it may consist of towage, is distinguished from "towage service," in that the latter has no reference to circumstances of danger.**

"Salvage service" is distinguished from "towage service," in that the latter is rendered for the mere purpose of expediting a vessel's voyage, without reference to any circumstances of danger, though the service in each case may be rendered in the same way.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Towage.]

4. **Salvage** ⬤⟹34—**Three tugs held entitled to salvage award of $1,700 for towing steamship, valued at $93,000, from danger of burning vessel at pier; "salvage service."**

Service rendered by three tugs in towing a steamship, valued at $93,000, from her pier, where there was actual apprehension of danger from a burning vessel near by, *held* a "salvage service," and the tugs *held* entitled to an award of $1,700, $700 to one and $500 each to the others.

In Admiralty. Suit for salvage by the Cottman Company and others against the steamship Emanuel Stavroudis. Decree for libelants.

Marbury, Gosnell & Williams, of Baltimore, Md. (William L. Marbury, of Baltimore, Md., on the brief), for libelants.

Janney, Ober, Slingluff & Williams, of Baltimore, Md. (Robert W. Williams, of Baltimore, Md., on the brief), for respondent.

COLEMAN, District Judge. The question here involved is one of salvage on account of service claimed to have been rendered to the steamship Emanuel Stavroudis by the libelants in towing her to a place of safety on the evening of January 4, 1927, from her berth on the north side of one of the Baltimore & Ohio Railroad coal piers at Curtis Bay, Baltimore, on the south side of which pier the steel bark Richelieu, a French naval training vessel, was then burning, due to a fire of unknown origin.

[1] The first point in the case is whether the service rendered by the three tugboats belonging to the libelants was requested or authorized, directly or indirectly, by those in command of the steamship Emanuel Stavroudis. This steamship was of Greek ownership, built in 1903, of iron and steel construction, 398 feet long, 4,931 gross tons, valued at $93,924, and light at the time. The tug Margaret belonged to the Cottman Company, the original libelant, and the other two tugs, the Maryland and the Favorite, were the property of the intervening libelant, the Chesapeake Lighterage & Towing Company. The value, dimensions, etc., of these three vessels need not be referred to, other than to the extent of saying that it was admitted they were all three seaworthy and fully capable of performing, and accustomed to perform, the usual lighterage and towing services incident to a large and important port, such as Baltimore. The steamship was about to coal, preparatory to sailing for Alexandria, Egypt, on the following day. Her bow was inshore, port side to the pier, and the Richelieu was moored on the opposite side of the pier, stern inshore. Being considerably further inshore than the steamship, and being of less length (323 feet), the Richelieu's bow was about opposite the bow of the steamship. The pier was of modern steel and concrete construction, 111 feet wide. The steamship was made fast to the pier by three lines forward and three aft, one of the forward and one of the aft lines being spring lines.

Upon learning of the fire on the French vessel, which appears to have started about 5 p. m., the masters of the three tugboats brought their vessels alongside the Emanuel Stavroudis and inquired of those in charge of her whether they desired her to be removed to a place of safety. There is an ir-

reconcilable conflict in the testimony as to what was then said and done by those on board the steamship. Seven of her officers and crew, including the chief officer, who was in charge of her at the time, and also her chief engineer, testified. Summarizing the testimony of all of these witnesses, it is to the effect that they not only did not invite the assistance of any of the tugs, but that, on the contrary, the same being offered, they declined it, claiming that they did not believe their vessel to be in any danger from the fire on the Richelieu; that nevertheless, without their authority, some person or persons, not connected with the steamship, caused her lines to be cast off and caused her to be towed out into the stream, where those in command of her reluctantly anchored her for the night, with a consequent loss of time and money, before she could be towed back the following morning to her berth at the pier and preparations for her voyage completed. However, there is scant evidence on the part of the steamship that any of her officers or crew directly declined the proposal from the tugboats that she be taken from the pier. On the contrary, it is admitted that, after her lines were cleared and she started to leave the pier, there was acquiescence in what was being done. Nor did those on board the steamship remonstrate when the master of the tug Favorite came aboard and from the bridge superintended the operation. Once the vessel was moving, they in fact asked that she be pushed out "a little bit," and agreed upon where she should be anchored. There is a conflict in the testimony as to whether the steamship had, at the time, sufficient steam in her boilers to enable her to use her engines, had this been attempted.

Turning to the evidence on behalf of the tugboats, it appears that the Maryland received a line thrown from the stern, starboard side, of the steamship, and was given the order to take the steamship out by the latter's chief officer; that the tug Margaret put two men on the pier, who let go the steamship's lines; that this tug's own line was passed to the stern, port side, of the steamship, where it was made fast; and, further, that the tug Favorite passed a line to the bow of the steamship, and her master came aboard the steamship, and from the bridge superintended the towing out of the steamship, all of which happened within a period of time not exceeding three-quarters of an hour. The master of the Maryland further testified that he also boarded the steamship after she had been removed into the stream, and was cordially thanked by the chief officer for what he had done.

It is clear from the evidence on both sides that the fire on the Richelieu was severe, due to her cargo of pitch; that the fire was attended with several explosions; that the vessel was badly damaged, and ultimately sank at her pier. A fresh wind (about 16 miles per hour) was blowing at the time from the southwest towards, if not in fact across, the stern of the steamship. The weather was not otherwise adverse, but it was dark, and the air was filled with smoke and some débris. Two fireboats played their streams of water on the Richelieu, and a third alarm was sounded for fire apparatus of the city of Baltimore. It appears to have been impliedly, if not expressly, admitted that a number of persons on the Richelieu were seriously, and some fatally, injured. Due to its fire-proof construction for the most part, little damage was caused to the pier or its equipment, and no other vessels or property of any description appear to have been damaged. There were no other vessels at this same pier at the time, other than several lighters at the bow of the Richelieu, which were rescued.

In all, 30 witnesses testified; so the evidence is rather lengthy. There are numerous other details, which might be alluded to, but which are omitted because in the opinion of the court enough has been referred to, in order to show that, even admitting there was no express authority given at the outset to remove the steamship, nevertheless the subsequent conduct of those in charge and on board of her contains all the essential elements of a ratification of, or acquiescence in, what was done, if indeed it can reasonably be believed that the vessel's lines, by which she was made fast to the pier, could have been cast off from the pier without first having been eased on the vessel itself. If they could not have been, then the discussion as to who, or by what authority, the lines were cast off from the pier, becomes secondary, if not immaterial. The weight of the evidence is to the effect that they were so eased, and that this was done by those identified with the steamship, and not by those connected with the tugboats.

The court is not unmindful of the possible handicap under which some of the officers and crew of the steamship labored in giving their testimony because of their Greek nationality, and consequent limited knowledge of the English language; but they were afforded the benefit of an interpreter, and the conclusion, after reading their testimony, is

inescapable that a certain amount of evasion was resorted to by at least some of them. For example, the statement of the chief officer that, even had he deemed it wise to move his vessel, he could not have done so without orders from the absent master, indicates such incompetency or such prevarication as to entitle the evidence to no weight, in either event. In a word, the attitude of those in charge of the steamship seems to have been this: They were frightened, quite naturally, by the character of the fire and its proximity. Their fright was augmented by the absence from the steamship of her master, and ignorance as to what cargo the Richelieu might contain. Those in charge did not quite know what to do, whether to say "Yes" or "No" to the masters of the tugboats; so at first they took the middle ground, and merely permitted the tugboats to make fast while they contemplated the situation further. Upon the fire failing to abate, they acquiesced in the proposal that the steamship be towed out into the stream. This having been done, and having found that their action was of doubtful necessity, and would perhaps be the subject of censure from those higher in authority, they endeavored to repudiate what they had done. But this is not permissible, because, while salvage cannot be exacted for assistance forced upon a vessel, still a request for, or express acceptance of, the service, is not always essential to the validity of the claim, if the aid or benefit resulting to the vessel is direct, and not merely incidental. Merritt & Chapman Derrick Co. v. United States, 47 S. Ct. 663, 71 L. Ed. ——.

[2, 3] A salvage service is a service which is voluntarily rendered to a vessel in need of assistance, and is designed to relieve her from distress or danger, either present or to be reasonably apprehended; and salvage is the reward or compensation allowed by the maritime law for service rendered in saving maritime property, at risk or in distress, by those under no legal obligation to render it, which results in benefit to the property, if eventually saved. The Blackwall, 10 Wall. 1, 19 L. Ed. 870; The Pleasure Bay (D. C.) 226 F. 55; The Neshaminy (C. C. A.) 228 F. 285. Salvage service is to be distinguished from towage service, in that the latter is a service which is rendered for the mere purpose of expediting a vessel's voyage, without reference to any circumstances of danger, although the service in each case may be, and frequently is, rendered in the same way. Thus the evidence in this case as to the cost of bringing the steamship to and

from the same pier at other times is not controlling. Salvage is not to be viewed merely as pay, but as a reward, allowed from motives of public policy. The Lowther Castle (D. C.) 195 F. 604.

In the present case, the aid rendered was, irrespective of its value, unquestionably both direct and in the nature of salvage, not towage. Therefore the situation is governed by the same rule applied in salvage cases, where the aid was expressly solicited, because, as we have just seen, a request for, or express acceptance of, the service is not always essential, and here the weight of the evidence is to the effect that there was at least an implied acquiescence in, and ratification of, what was done.

In The Bessie Whiting (D. C.) 35 F. 79, a schooner was lying at a wharf when fire broke out in oil works in the vicinity. The mate of the schooner applied for assistance to a tug, which took it into the stream. Judge Benedict allowed compensation to the tug. In The Carondelet (D. C.) 36 F. 714, a steamer was lying at a wharf, with steam up, when a lighter near by caught fire. A tug, at the request of the master of the steamer, took her into the stream and held her there until the burning lighter had been removed, when she took her back to the wharf. Judge Benedict, who also decided this case, said, in awarding compensation (page 715): "No doubt the service was a salvage service; it was a voluntary service rendered to a vessel in peril, and was successful." See, also, Stevens et al. v. Steamboats S. W. Downs and Storm, Fed. Cas. No. 13411; The Lowther Castle, supra; The Acre (D. C.) 195 F. 1022.

In The Lowther Castle, the court said (page 608): "That no loss would have been sustained by the steamship had it remained at the pier, that no injury resulted to the steam tug in the services rendered, that no real danger attended the crew of the steam tug during the rendition of such service, that but little time was consumed in the moving of the steamship from the pier to its anchorage up the stream, does not affect the character of the services, and change it from salvage to towage." If we substitute in the above quotation the word "tugs" for "tug," the language is strikingly descriptive of the present case.

[4] Since, therefore, the tugs are entitled to salvage, it remains to be determined how much each is entitled to receive. The reports of admiralty cases are replete with recitals of the elements to be considered in determining the amount of salvage. These

elements, briefly summarized, are (1) the danger, actual or *apprehended,* to the ship receiving the service; (2) the value of such ship; (3) the labor expended, and the promptitude, energy, and skill displayed by the salvors in saving the property; (4) the value of the property they employed in the service; and (5) the risks and damage to which it was exposed. The Blackwall, and The Pleasure Bay, supra.

Measured by this test, we find that the Emanuel Stavroudis was unquestionably in a situation of actual apprehension, even if not of actual danger, as later developed. The weight of the evidence is clear that she could not have gone out under her own steam. The fire in the Richelieu had apparently all the elements of a serious one, especially in view of the explosions which occurred, due to her inflammable cargo of pitch. The fact that those in charge of the pier, as well as those who fought the fire, testified that they did not consider it necessary to move the steamship, is not controlling. The Stavroudis was a fair-sized vessel and in good condition. While not laborious or lengthy, the services rendered by the tugs were prompt, energetic, and skillful; the master of one of them, the Favorite, taking command of the steamship during the operation. The fact that such may be customary in simple towage or pilotage cases is not controlling. The tugs were of a value commensurate with such work. The risks they ran and the damage to which they were exposed were, it is true, not great.

The court believes that the amount of the award lies somewhere between that which was allowed in The Alice (C. C. A.) 244 F. 415, a case relied upon by the respondents, and in The Santa Barbara (C. C. A.) 299 F. 152, stressed by the libelants. In The Alice $1,000 was allowed to one tug and $500 to another, which towed a steamship worth considerably more than the Emanuel Stavroudis from her berth at a pier some 365 feet from, but not adjacent to, a burning grain

elevator. These latter facts, contrasted with the situation in the present case, where the steamship was at the same pier where the fire was burning and more than three times as close to it—that is, only 111 feet away—are of themselves sufficient to justify some increase of the total sum to be allowed. The Santa Barbara, in which, on appeal, an allowance of $1,000 to three tugs was held inadequate and increased to $8,500, is clearly distinguishable, if for no other reasons than that the steamship was pulled away from a burning pier on which she had discharged a cargo of nitrate, and had a large quantity of fuel oil in her lower tanks, and also had herself caught fire.

No two cases of this general class can be exactly alike. So such precedents as exist are not to be used as would be a yardstick, but simply as a guide. For example, the compensation allowed in The Bessie Whiting, and the Carondelet, supra, which are herein relied upon as precedents for establishing liability on the part of the Emanuel Stavroudis, would obviously be grossly inadequate in the present instance, because of many and important differences in the facts. Parenthetically, it is not amiss to point out that the present greatly increased cost of labor in maritime as well as land pursuits often renders obsolete the awards made in the older decisions.

The court believes that a total allowance of $1,700 is just and reasonable under all the circumstances of the case; $700 to the tug Favorite, because of the somewhat more important service which her master performed in taking command of the steamship, two-thirds to the owner, one-third to the master and crew, to be distributed in proportion to their wages; and $500 each to the tugs Maryland and Margaret (the services of these two being not materially different), to be distributed in the same proportions as the award to the Favorite.

A decree will be signed in accordance with the foregoing awards.