**LA RUE et al. v. UNITED FRUIT CO.**

No. 6079.

United States Court of Appeals
Fourth Circuit.

Argued April 21, 1950.

Decided May 11, 1950.

896

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is an appeal from a final decree of the United States District Court for the District of Maryland dismissing a libel filed by thirty-three unlicensed crew members of the S. S. Fra Berlanga and three shore workmen against the United Fruit Company. Libelants sought to recover for alleged salvage services rendered to the S. S. San Jose on November 29, 1948, in the harbor of Puerto Cortes, Honduras. Upon the conclusion of all the evidence, the District Court dismissed the libel on the ground that the service rendered did not rise to the dignity of salvage.

The San Jose and the Fra Berlanga are sister ships, owned by the United Mail Steamship Company, a subsidiary of the respondent, United Fruit Company, and were used in the banana carrying trade between Central America and the United States. We quote from the Findings of Fact of the District Judge:

"2. On the morning of November 29, 1948, the two ships were in (the) harbor of Puerto Cortes, Honduras, the Fra Berlanga being moored to the dock preparing to begin loading a cargo of bananas that afternoon, and the San Jose being anchored in the harbor and being scheduled to begin loading on December 1, 1948. Neither ship had any cargo on board.

"3. The harbor of Puerto Cortes is protected on the north, south and east by land. The entrance to the harbor faces west, and there is also land to the west, a distance of about 6 miles from the entrance to the harbor. The harbor is sheltered and safe. The highest wind encountered there is force 7 on the Beaufort Scale, and due to the surrounding land such wind has no appreciable effect on the water in the harbor. The rise and fall of the tide in the harbor is about 8 inches.

"4. About 4 A.M. Eastern Standard Time on November 29, 1948, a sudden wind squall from the southwest (force 6-7) arose, and the San Jose, which had only

I. Duke Avnet, Baltimore, Md., for appellants.

Southgate L. Morison, Baltimore, Md. (Ober, Williams, Grimes & Stinson, Baltimore, Md., on the brief), for appellee.

her starboard anchor out, began dragging her anchor. The chain on this anchor was payed out to 4½ shackles, and at 4:20 A. M. her port anchor was dropped. The two anchors held and stopped the vessel's drift. Her port quarter then rested against a soft mud bank, but her bow was held clear of the bank by her starboard anchor. About 75 feet of the after part of her keel was resting in soft mud to a depth of from one foot to one and one-half feet.

"5. The San Jose's draft was 14 feet forward, and 21 feet, 6 inches aft. After she came to rest soundings were taken, and showed 20 feet at her stern, and 30 feet at her bow. Along the port side from aft to forward the soundings were 18 feet, 14 feet, 19 feet, 24 feet. Along the starboard side from aft to forward the soundings were 25 feet, 30 feet, 35 feet, 35 feet. Soundings were taken hourly and showed no change.

"6. After the vessel came to rest a bearing from the ship to the east end of the dock (⁹⁄₁₀ of a mile away) was 319 degrees. Bearings were taken constantly thereafter and showed no change until the Fra Berlanga started assisting her.

\* \* \* \* \* \*

"9. At 12:06 P.M. Eastern Standard Time the Fra Berlanga left her dock to assist the San Jose. At 1:43 P.M. two Manila hawsers were secured between the sterns of the vessels. When the Fra Berlanga went slow ahead on her engines, pulling against the wind, the San Jose was pulled free of the mud bank for a distance of from 3 to 4 feet, but just then one of the lines parted (at 1:50 P.M.), and the other at 1:51 P.M., and the San Jose's port quarter was blown back against the mud bank. At 3:15 P.M. a wire rope and a Manila hawser were secured between the two ships, but at 4:25 P.M. both parted. At 7:25 P.M. two insurance wires were made fast between the two vessels. At 8:05 P.M. the Fra Berlanga went dead slow ahead on her engines, at 8:14 P.M. slow ahead at which time the San Jose was moving astern. At 8:15 P.M. the San Jose was clear of the mud. At 8:50

P.M. the San Jose anchored, and at 8:53 P.M. the Fra Berlanga anchored.

\* \* \* \* \* \*

"11. During the operation the wind continued (southwest, force 6-7 (Beaufort Scale) until about 8 P.M. when it had moderated to force 4-5. The sea was choppy, but did not have any effect on either ship. The Fra Berlanga had no difficulty in maneuvering.

"12. All members of the crew of the Fra Berlanga received their wages, and such as worked overtime were paid overtime wages.

\* \* \* \* \* \*

"14. Neither ship sustained any damage whatsoever, nor was any member of the crew of the Fra Berlanga injured.

"15. The cargo of bananas scheduled for the San Jose was loaded on another vessel."

■ There was evidence that the San Jose's bottom was not pounding on the mud bank and that there was no more movement of the vessel than is normal in a ship moored to a dock. The masters of both ships testified that the San Jose was in no danger, and the master of the Fra Berlanga testified that his ship was in no danger. There was also evidence that the San Jose could have freed herself by the use of her kedge anchor and that if the wind had reversed its direction, she would have been blown off the mud bank. This evidence was accepted by the District Court which stated: "The principle evidence submitted for the libelants as to the facts was that given by two or more members of the crew testifying by deposition and one whose testimony was given in court; the latter serving on the ship at the time as an able-bodied seaman but having had previous experience and service as a ship's officer. And in addition the libelants submitted the evidence of a ship Master testifying as an expert with regard to salvage operations, but who was not personally familiar with the harbor of Puerto Cortes, and also another expert who was a marine surveyor, also not familiar with the particular harbor. Weighing the testimony of the re-

spective witnesses I find that of the Masters of the two ships more persuasive."

It is elementary that issues of fact involving credibility should be resolved by the trial judge and not by the appellate court.

The San Jose remained on an even keel at all times, thus showing that she was resting lightly against the mudbank. Force 6 is a strong breeze with a wind of twenty-two to twenty-seven knots per hour. Its effect ashore is that large branches are in motion, whistling is heard in telegraph wires and umbrellas are used with difficulty. Force 7 is a moderate gale with wind of from twenty-eight to thirty-three knots per hour. Its effect ashore is that whole trees are in motion and inconvenience is felt in walking against the wind. See Knight's Modern Seamanship, 10th. Edition, 1937, page 673. A small motor launch was able to operate without difficulty between the two ships.

 On the facts before us we cannot set aside the District Court's finding that the services rendered to the San Jose were towage and not salvage. A concise statement of the distinction between towage and salvage is found in The Emanuel Stavroudis, D.C., 23 F.2d 214, 216, 1927 A.M.C. 1313, 1317: "A salvage service is a service which is voluntarily rendered to a vessel in need of assistance, and is designated to relieve her from distress or danger, either present or to be reasonably apprehended; and salvage is the reward or compensation allowed by the maritime law for service rendered in saving maritime property, at risk or in distress, by those under no legal obligation to render it, which results in benefit to the property, if eventually saved. The Blackwell, 10 Wall. 1, 77 U.S. 1, 19 L. Ed. 870; The Pleasure Bay, D.C., 226 F. 55; The Neshaminy, 3 Cir., 228 F. 285. Salvage service is to be distinguished from towage service in that the latter is a service which is rendered for the mere purpose of expediting a vessel's voyage, without reference to any circumstances of danger, although the service in each case may be, and frequently is, rendered in the same way."

To the same effect see The Mercer, 2 Cir., 297 F. 981, 984.

Libelants contend that whenever "a stranded vessel is floated by another vessel, this constitutes more than simple towage and is in fact salvage." An examination of the cases upon which libelants rely, however, does not support any such broad concept of salvage. In most of the cases which allowed salvage for the rescue of a stranded vessel, the ship was unable to free itself and even if not in imminent danger would have been in peril in case of storm. Thus in DeAldamiz v. Th. Skogland & Sons, 5 Cir., 17 F.2d 873, at page 874, the Court said: "There was real danger that the Per Skogland would become a total loss. It is idle to argue that a ship aground in shallow water on a sea beach, exposed to wind and wave in the hurricane season, is in a safe place."

In The Leonie O. Louise, 5 Cir., 4 F.2d 699, at page 700, it was stated: "Although the danger was not imminent, it was reasonably to be apprehended, and there was pressing necessity for prompt action to return the schooner to the water. She was out of commerce and useless in her then situation—to all intents and purposes a total loss as a vessel unless floated."

In The Freedom, 1932 A.M.C. 933 at page 935, the Court said: "It is not necessary that there be danger immediately impending, but if the vessel is stranded so that it is subject to the potential danger of damage or destruction she may well be a subject of salvage services."

One of the cases most favorable to libelants is The Sahara, D.C., 246 F. 141, 142, where the Court found that "the ship's engines might have gotten her off" and "during all the time the weather was good, and the ship was in no imminent danger." A salvage award was granted but the Court went on to say, 246 F. at page 142, that "the coast, however, is very dangerous, and no ship can wisely take chances with it." See also Baker v. Hemenway, 2 Fed. Cas. page 463, No. 770, where a stranded vessel could have freed herself, but a salvage award was allowed because it was doubtful whether she could have got-

ten off before high water, at which time she would have been placed in a dangerous situation.

 In the instant case there was substantial evidence to support the conclusion of the District Court that the San Jose was not in danger, either imminent or reasonably to be apprehended. There was, as previously stated, evidence that the San Jose was in a protected harbor, anchored so as to prevent her from being blown farther aground, and that she could have gotten off the mudbank unaided.

In Bond v. A. H. Bull S. S. Co., D.C., 13 F.2d 893, 894, 1926 A.M.C. 1120, a vessel was stranded and unable to get off under her own power. Under a contract of towage which stipulated that the service was not salvage, the ship was freed by a tug. Though the Court stated that "the ship cannot deprive the crew of their salvage rights," the crew of the tug were not allowed any salvage award. In Stone v. Tug Pejepscot, 1939 A.M.C. 316, a tug and barge went aground. The weather was good and the vessels were in no danger. Attempts to pull the tug off were successful and the barge finally managed to free itself. The Court held that the service to the grounded vessels was high towage and not salvage.

No officer of the Fra Berlanga is a party to this case, and it appears from the entries made in the rough deck logs of the respective ships that the operation was regarded as towage at the time it was performed. The entries in the Fra Berlanga log were: "11:06 left dock Cortes to assist hauling San Jose from against mudbank Cortes Harbor * * *. Various engine movements to keep ship in position for towing San Jose * * *. 6:26 our towing wire all fast to San Jose. 6:52 towing wire from San Jose all fast to our ship." The entry in the San Jose log stated: "crew engaged preparing lines and wires for towing purposes." The captain of the Fra Berlanga testified that he did not regard the operation as salvage.

The District Court made the following Finding of Fact: "8. The San Jose did not request assistance, but Captain Stark, of the Fra Berlanga, offered to pull her off, and Captain Bauer of the San Jose accepted in order to avoid being delayed in loading in the event that the wind did not moderate or change its direction promptly."

This Finding is based on the uncontradicted testimony of the masters of both vessels. The Fra Berlanga would naturally be expected to come to the aid of its sister ship as a matter of course. Again we quote from the opinion of the District Judge: "The inference would seem to be very clear indeed that the master of the San Jose would never have accepted the proffered assistance of the Fra Berlanga, unless perhaps by the express direction of the owners, if there had been any suggestion or intimation that there would be a claim for salvage services in the substantial amount of thousands of dollars."

The judgment of the District Court is affirmed.

Affirmed.