**SQUIRES et al. v. THE IONIAN LEADER et al.**

Civ. A. No. 11627.

United States District Court
D. New Jersey.

Oct. 31, 1951.

Benjamin B. Sterling, New York City, S. Eldridge Sampliner, Cleveland, Ohio, for libelants.

Lindabury, Steelman & Lafferty, Newark, N. J., for respondent The Ionian Leader.

Grover C. Richman, Jr., U. S. Atty., Newark, N. J., for respondent-impleaded United States.

832

SMITH, District Judge.

This is a suit in admiralty in which the libelants, members of the crew of the Motor Vessel Farallon, assert a claim for salvage against the Steamship Ionian Leader, a foreign vessel owned by Compania De Navagacion Cristobal, S. A., the respondent. The United States of America was impleaded on the petition of the said respondent, filed pursuant to Rule 56 of the Admiralty Rules, 28 U.S.C.A.

Facts

I.

The Steamship Ionian Leader, hereinafter identified as The Leader, was a standard Liberty type dry cargo vessel of 7,176 gross tonnage and 4,380 net tonnage. This vessel was built in 1944, and in March of 1947, when she was allegedly salved, she was reasonably valued at $425,000. This valuation has been stipulated.

II.

The Motor Vessel Farallon, hereinafter identified as The Farallon, was owned by the United States of America and was operated by the Moran Towing & Transportation Co. Inc., hereinafter identified as the Moran Company, under a General Agency Agreement. This vessel was of sturdy construction and was designed and equipped for ocean towage. It is stipulated that in March of 1947 she was reasonably valued at $300,000.

III.

The libelants were members of the crew of The Farallon, which was, and had been prior to March of 1947, engaged in coastwise towage along the eastern seacoast. The vessel was, and had been, used primarily in the towage of decommissioned vessels owned by the United States of America. There is no evidence that she had been engaged in salvage operations either under contract or otherwise.

IV.

The Farallon was in port at Norfolk, Virginia, on the evening of March 7, 1947, when the Moran Company received a call for assistance from a tanker, The McKit-trick Hills, which was disabled and in distress at a point approximately 500 miles east of the Islands of Bermuda. The members of the crew, the present libelants, immediately made preparations to proceed to sea to the assistance of the tanker; The Farallon was fueled and sufficient stores were taken aboard.

V.

The Farallon took her departure at 1000 (10 A.M.) on March 8. When the vessel left port the sea was moderately rough and the wind was fresh to strong (Beaufort Scale 5 to 6). The sea and weather conditions remained about the same until 0400 (4 A.M.) on March 10, when the sea and the wind subsided; the force of the wind decreased to gentle to moderate (Beaufort Scale 3 to 5). The conditions remained the same until March 12, when there was a slight increase in the swell of the sea and the force of the wind; the sea was moderate and the force of the wind was moderate to strong. (Beaufort Scale 4 to 6).

VI.

While enroute seaward to the assistance of The McKittrick Hills on March 12, The Farallon received a message that The McKittrick Hills was able to proceed under her own power and was no longer in need of assistance. The Farallon was at that time approximately 120 miles east of the Islands of Bermuda. The Farallon changed her course upon receipt of the message and then proceeded shoreward. When The Farallon was enroute shoreward she received orders by radio telephone to go to the assistance of The Leader.

VII.

The Leader was on a voyage from Rio de Janeiro, Brazil, to Hampton Roads, Virginia, without cargo and in ballast, when her propeller shaft broke and her propeller was lost. This accident occurred at 1943 (7:43 P.M.) on March 11, while the vessel was "in position latitude 23° 14' north, longitude 57° 57' west." This position is approximately 500 miles south and east of the Islands of Bermuda and in a "well travelled steamer route." The vessel

was in no immediate or proximate danger but she was in distress and in need of assistance; the necessary repairs could not have been made at sea. Thereafter, and until taken in tow, the vessel carried the prescribed signals indicating that she was "not under command." See 33 U.S.C.A. § 74.

## VIII.

The radio log of The Leader discloses that on March 12 the master transmitted to the agent of the owner (via Mackay radio) the following message: "Broken Shaft Lost Propeller Lat. 23.14 North Long 57.55 West Telegraph Whether You Will Send Tug Require Assistance From Vicinity Ships." Thereafter, and on the same date, the master received from the agent of the owner the following message: "Tug Farallon Now 600 Miles Off Proceeding Your Position At Fourteen Knots To Tow You Hampton Roads But Attend Radio Case Diversion Jacksonville Or New York Stop Radio Weather Also Report Nine Each Morning Acknowledge." This message was received at 1400 (2 P.M.). It should be noted that The Leader was still 300 miles or more from the nearest shore and was in no immediate danger.

## IX.

It appears from the evidence that prior to the transmission by the agent and receipt by the master of the latter message, the agent had contacted a representative of the Moran Company and engaged the services of The Farallon. The terms of the agreement were reduced to writing and are embodied in two letters, a letter of March 12, 1947, a copy of which is annexed hereto and marked Exhibit A, and a letter of March 17, 1947, a copy of which is annexed hereto and marked Exhibit B. It is significant that the services of The Farallon were made available to The Leader at a cost of $2,500 per day, the customary rate for ordinary towage service.

## X.

The Farallon received orders on March 12 at 1600 (4 P.M.) to go to the assistance of The Leader, which was still approximately in the same position but slowly drifting northeast. The Farallon, which was enroute shoreward upon receipt of the message, changed her course and proceeded southward to the assistance of The Leader; at the time, The Farallon was still east of the Islands of Bermuda. The Farallon and The Leader exchanged radio messages at approximately 2100 (9 P.M.), and thereafter communications between them were maintained.

## XI.

The Farallon reached The Leader at 0730 (7:30 A.M.) on March 15. The masters of the vessels exchanged radio messages, and the crew of The Farallon, having previously readied its lines and other equipment, maneuvered their vessel into position preparatory to taking The Leader in tow. The Farallon was backed close to the bow of The Leader, and after several unsuccessful efforts the crew of the latter passed a heaving line to the crew of the former. The hawsers were secured at approximately 0930 (9:30 A.M.), and shortly thereafter the tow got under way shoreward.

## XII.

The entire operation hereinabove described was completed in about two hours, as disclosed by the logs of the respective vessels. The Leader was taken in tow without much difficulty, but the crew of The Farallon were exposed to the usual hazards of the sea incident to a salvage operation of comparatively low order. The sea was rough and the force of the wind was fresh to strong (Beaufort Scale 5 to 6).[1] Several members of the crew of The Farallon testified that the swell of the sea broke over the after-deck of their vessel during the salvage operations. However, the photographs offered in evidence by the libelants

1. Beaufort Scale of Wind Force.
 5. Small trees in leaf begin to sway; crested wavelets form on inland waters.

 6. Large branches in motion; whistling heard in telegraph wires; umbrellas used with difficulty.

834

would appear to depict a moderately rough sea, as distinguished from a high sea; these photographs depict no unusually hazardous conditions. (Exhibit L-6.)

## XIII.

The Farallon experienced no difficulty with the tow until March 19, at approximately 1600 (4 P.M.), when the sea and the force of the wind began to increase; the change in conditions is reflected in the log of each vessel, but the logs are not in agreement as to the degree of change. There is no dispute that prior thereto the sea was moderate and the force of the wind was gentle to strong (Beaufort Scale 3 to 6); in fact the wind force increased to 6 only on March 17 between 1200 (12 noon) and 1600 (4 P.M.). The tow was following well and The Farallon maintained an average speed of approximately 8 knots.

## XIV.

The vessels encountered a moderate storm at midnight on March 19, which continued until approximately midnight on March 22, when weather conditions became more favorable. The sea was heavy, rough and confused during the storm, and the force of the wind increased until 0400 (4 A.M.) on March 22, when it reached a force of 10, gale force. These conditions prevailed until midnight or shortly thereafter, when the storm and the force of the wind subsided. The weather conditions improved on March 23, and thereafter the vessels encountered no unusual or hazardous weather conditions. There can be no doubt that The Farallon experienced considerable difficulty with the tow during the period of the storm and that the members of the crew were exposed to hazards greater than those incident to coastwise towage service.

## XV.

The vessels arrived at Hampton Roads, Virginia, at 0330 (3:30 A.M.) on March 24, 1947. The tow was let go and the hawser was taken aboard The Farallon. Thereafter The Farallon proceeded to Norfolk, Virginia, where it docked. It is stipulated that a routine inspection of the vessels disclosed that there was no damage to either of them.

## XVI.

The respondent paid to the Moran Company the sum of $26,710.07 for the services rendered. The libelants were paid their usual wages plus earned overtime compensation; they were paid nothing by way of or in lieu of a salvage award.

## Discussion

 The claim for salvage is here opposed by the respondent on the ground that the service rendered by the libelants was nothing more than a towage service. We cannot agree. A towage service is to be distinguished from a salvage service: the former is one which is rendered for the mere purpose of expediting the voyage of a vessel, without reference to any circumstance of danger; the latter is one which is voluntarily rendered to a vessel in need of assistance, and is designed to relieve her from distress, either immediate or reasonably apprehended. The elements of the latter, briefly stated, are (1) a marine peril, (2) a service voluntarily rendered, and (3) success either in whole or in part. The Lowther Castle, D.C., 195 F. 604, 605; The Neshaminy, 3 Cir., 228 F. 285, 288; The Emanuel Stavroudis, D.C., 23 F.2d 214, 216; Elrod v. Luckenbach S. S. Co., D.C., 62 F.Supp. 935, 936; LaRue v. United Fruit Co., 4 Cir., 181 F.2d 895, 898. See also the other cases hereinafter cited. The service here rendered by the libelants meets the commonly accepted standards and was clearly one in the nature of salvage.

 It is conceded that The Leader was in no immediate danger, but it is obvious that the loss of her propeller exposed her to the perils of the sea. It has been held that: "Assistance to a vessel in a situation of actual apprehension, though not of actual danger, is salvage service." The Neshaminy, supra [228 F. 288] See also The Great Northern, D.C., 72 F. 678. The mere fact that The Leader was in no immediate danger did not change the nature of the service which was here rendered by the libelants; the vessel was in distress

at sea, and the assistance rendered here was in the nature of salvage. The Catalina, 5 Cir., 105 F. 633, 635, 636.

■ The respondent further urges that the recovery of an award is precluded by its contract with the Moran Company. It is argued that the service which was rendered was contemplated by the contract. The respondent engaged the services of The Farallon at the usual towage rates, to wit, $2,500 per day, and as between it and the Moran Company, the contract might be construed as barring any claim for salvage by the latter. The Kennebec, 231 Fed. 423. However, we need not decide the question because there is no claim here made by either the Moran Company or the United States of America. The contract, even if valid and enforceable as between the parties to it, did not affect the right to salvage here asserted by the libelants. There is no evidence before the Court that the libelants had any knowledge of the contract or consented to a waiver of their rights; in fact, the only crew members who testified at the trial denied that they had such knowledge.

■ It is our opinion that the contract in question could not affect the rights of the crew unless with full knowledge of its terms they consented to waive their claim for salvage. "The owner of a salving vessel may by agreement fix the amount which is to be paid to him for salvage services, and this agreement will be enforced. But such agreement cannot bind his crew unless they assent to it. If, however, the amount received by him under the agreement is a reasonable compensation for the *full salvage service* including the services of the crew, he may be compelled to distribute to the crew their proportion of such amount. The crew, however, are not bound to look to him for their reward, but may look to the salved vessel and its owners, for neither the agreement of the owners nor the payment of the money is binding on them without their assent thereto." Bergher v. General Petroleum Co., D.C., 242 F. 967, 970. See also The Lowther Castle, supra, 195 F. 608; Bond v. A. H. Bull S. S. Co., D.C., 13 F.2d 893, 894;

McKnight v. New Orleans Coal & Bisso Towboat Co., 5 Cir., 39 F.2d 457, 458.

■ We entertain some doubt that even a consent to the contract by the libelants would have affected their claim for salvage. The pertinent provisions of the statute, 46 U.S.C.A. § 600, would seem to render such a consent void. The statute provides: "every stipulation by which any seaman consents * * *, to abandon any right which he may have or obtain in the nature of salvage, shall be wholly inoperative." This statutory provision was undoubtedly intended to protect seamen, who seem to have been traditionally recognized as the wards of admiralty, against contracts which required a waiver of their rights as a condition of employment.

■ The award of salvage is paid to seamen as a reward for meritorious service, as distinguished from compensation for work and labor performed. The explanation of Judge Woodbury in the case of United States on Behalf of Lord Com'rs v. The James L. Richards, 1 Cir., 179 F.2d 530, 532, is apposite. It is therein stated: "And this practice accords with the definition of salvage in The Clarita and The Clara, 23 Wall. 1, 16, 23 L.Ed. 146, 150, in which it is said that 'Salvage is well defined as the compensation allowed *to persons* (Emphasis supplied) by whose assistance a ship or vessel, * * *, are saved from danger or loss in cases of shipwreck, derelict, capture, or other marine misadventures.' Moreover the practice also accords with the policy underlying the award of salvage which is given not merely to compensate on a quantum meruit basis the persons by whose voluntary assistance property is saved from peril or loss in navigable waters, but also to reward such persons by giving them a sort of bonus or bounty for their perilous services voluntarily rendered to the end that seamen and others may be induced to exert themselves to save * * * property in peril on the sea."

■ It is our opinion that each of the libelants, except Garrett Van Tassell, is entitled to an award equal to approximately one-half of his monthly salary, exclusive of overtime compensation. The libelant

Van Tassell is excluded only because there is no evidence before the Court that he was a member of the crew at the time the salvage service was rendered; his name does not appear on the payroll record of The Farallon for this period.

The total award in the amount of $2,982.25 is based upon the following elements: first, the value of the property in peril; second, the degree of peril, which in our opinion was not great; third, the skill exercised by the libelants in rendering the service, which in our opinion was the ordinary skill expected of competent seamen; and fourth, the hazards to which the libelants were exposed, which in our opinion were not unusual or extraordinary. Elrod v. Luckenbach S. S. Co., supra; Kittelsaa v. United States, D.C., 75 F.Supp. 845; Burke v. United States, D.C., 96 F. Supp. 335, 337. The award represents a fair reward for the meritorious service rendered by the libelants, as distinguished from compensation for work and labor performed.

There is no claim for salvage made by either the Moran Company or United States of America, but we have nevertheless given consideration to the fact that the Moran Company has been paid $26,710.07. It appears from the payroll records that the wages paid the libelants by the employer include adequate compensation, together with overtime, for the work and labor performed. It would be inequitable under the circumstances to include in the award for salvage the usual compensation for work and labor performed. It should be noted that this case differs from the usual case in which a claim for salvage is asserted, not only by the crew members but also by the owner of the salving vessel.

## Conclusions

### I.

The service rendered by the libelants was in the nature of a salvage service and the libelants are therefore entitled to an award in the amount of $2,982.25 against the respondent Compania De Navagacion Cristobal. A judgment in said amount in favor of the libelants and against the said respondent will therefore be entered.

### II.

The award made herein shall be apportioned as follows:—

| | |
|---|---|
| Roland W. Squires | $147.25 |
| Ernest M. Metts | 100.00 |
| W. H. Rose | 182.50 |
| Don Sherouse | 150.00 |
| Jack J. Anderson | 106.25 |
| Joe Liverman | 76.25 |
| Edwin McDonough | 150.00 |
| James H. Stevenson | 88.75 |
| William F. Gibbs | 81.25 |
| Josiah H. Woodington, Jr. | 100.00 |
| Donald H. Umland | 113.75 |
| Ray Sparrow | 118.75 |
| Fritz Kraul | 88.75 |
| David T. Johnson | 76.25 |
| Martin J. McEniry | 182.50 |
| Walter Connor | 100.00 |
| Richard P. McBride | 88.75 |
| Fred Hilton Cook | 100.00 |
| Arlie H. Ebright | 160.00 |
| Frank P. Preston, Jr. | 118.75 |
| Valand Copeland, Jr. | 76.25 |
| Ralph Thompson | 287.50 |
| Johannes A. Lorents | 88.75 |
| Richard S. Pittman | 100.00 |
| Ronald Wyse | 100.00 |
| Garrett Van Tassell | Nothing |

## Claim against the United States of America

The United States of America was impleaded on the petition of Compania De Navagacion Cristobal, filed pursuant to Rule 56 of the Admiralty Rules, 28 U.S.C.A. The jurisdiction of the Court to entertain the claim therein stated is apparently based upon the provisions of Section 2 of the Suits in Admiralty Act, 46 U.S.C.A. § 742. The United States of America filed exceptions in which it objected to the "jurisdiction" of this Court on the ground that the "petitioner was not a resident of this District and the tug Farallon was not within the District * * * at the time of the filing of the petition." The United States of America filed no answer.

The objection is actually an objection to the "venue" of the suit and not to the "jurisdiction" of the Court. The Act expressly provides that "a libel in personam may be brought against the United States" where "a proceeding in admiralty could be maintained" against a privately owned vessel. The Act further provides, however, that such "suit shall be brought in the district court of the United States for the district in which the parties so suing, * * *, reside or have their principal place of business in the United States, or in which the vessel * * * charged with liability is found." It is our opinion that the jurisdictional requirements of the statute are present but that the venue of the suit is improperly laid. The petitioner does not maintain an office in this district and there is no evidence that The Farallon was in this district at the time of the filing of the petition or at any time prior thereto.

The objection to the venue of the suit must be sustained for the reasons stated. It is our opinion, however, that the impleading petition should not be dismissed but that the case should be transferred to one of the two districts in which it could have been brought. 28 U.S.C.A. § 1406(a). We shall entertain a motion to transfer the case to a district convenient to the litigants.

Exhibit A.

Simpson, Spence & Young
8–10 Bridge Street
New York 4, N. Y.

March 12, 1947

Moran Towing & Transportation Co., Inc.
17 Battery Place
New York 4, N. Y.

Attention: Mr. Belford

Dear Sirs:

We confirm telephone conversation this morning during which we advised you of radio message being received from the Panamanian ss. "Ionian Leader" ex American Liberty Ship "C. Francis Jenkins", reading as follows:

"Broken Shaft Lost Propeller Lat 23.-14 North Long 57.55 West Telegraph Whether You Will Send Tug Require Assistance From Vicinity Ships"

Ownership of this vessel is with a company with which Mr. George Vergottis is associated and we informed Mr. Vergottis of your having advised us that the American tug "Farallon" was then about 600 miles from the position given in the Master's radio and proceeding at about fourteen knots toward the United States so that the distance between the "Farallon" and the "Ionian Leader" was becoming greater all the time.

You informed us that you estimated the "Farallon" should be able to reach the "Ionian Leader" in about two days and the "Farallon" could then tow the "Ionian Leader" to say Norfolk in about eight days. You also informed us that the cost for this service would be $2500.00 per day.

We confirm telephone conversation with you at about noon today informing you that owners request you to arrange for the "Farallon" to proceed immediately to the "Ionian Leader" and tow vessel to a destination to be decided later but probably a United States Atlantic Coast port.

Yours very truly,
Simpson, Spence & Young, Agents
JFC:MM
c.c. Mr. George Vergottis
c.c. Salvage Association, London
Att. Mr. Compton

Exhibit B
Moran Towing & Transportation Co., Inc.
17 Battery Place
New York 4, N. Y.

March 17, 1947

Simpson, Spence & Young
8–10 Bridge Street
New York, 4, N. Y.

Dear Sirs:

This will acknowledge receipt of your letter of March 12 with respect to the Ionian Leader.

You are correct that hire on the tug will be at the rate of $2500 per day, beginning at the hour of the day she was delivered to the assistance of the Ionian Leader and continuing until she arrives back at Norfolk after being discharged from this service.

Very truly yours,
Moran Towing & Transportation Co., Inc.