232 F.2d 750
 MISSISSIPPI VALLEY BARGE LINE COMPANY, Claimant of THE Barge MV 603, her tackle, apparel, etc., Appellant,
v.
INDIAN TOWING COMPANY, Inc., Owner of THE Tug CHEROKEE on behalf of itself and her crew members, Appellees.
 No. 15785.
 United States Court of Appeals Fifth Circuit.
 April 20, 1956.
 
 Selim B. Lemle, Geo. B. Matthews, Lemle & Kelleher, New Orleans, La., Proctors for Mississippi Valley Barge Line Co.
 Alfred M. Farrell, Jr., New Orleans, La., Terriberry, Young, Rault & Carroll, New Orleans, La., of counsel, for appellees.
 Before BORAH, TUTTLE and BROWN, Circuit Judges.
 BROWN, Circuit Judge.
 
 
 1
 While the appeal apparently asks us to assay the ruling of the District Court, we have a feeling that it is the former action of this Court, not the one below, which is really to be reviewed. This is so because, in an otherwise routine maritime salvage case presenting the usual factual controversies left wisely to the trial judge for resolution, the real question is whether we are committed to a specific rule which the District Court ought to have applied, but did not.
 
 
 2
 Of course, the process involves something more than determining what we have said. For what we have said — plainly printed, widely distributed, permanently preserved — is there for all to read. It is finally for us to say — not just repeat — what we said, and in actuality, this is: what did we mean by the words employed? E. g., Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911; Boston Metals Company v. S/S Winding Gulf, 349 U.S. 122, 75 S.Ct. 649, 99 L.Ed. 933; United States v. Nielson, 349 U.S. 129, 75 S.Ct. 654, 99 L.Ed. 939.
 
 
 3
 Specifically, the owner of the salved vessel MV 603, an integrated steel barge, insists that by two decisions in 1900, The Catalina, 5 Cir., 105 F. 633; The New Camelia, 5 Cir., 105 F. 637; a third in 1923, Magnolia Petroleum Co. v. National Oil Transport Co., 5 Cir., 286 F. 40, and two others of the same era, The Colonel Moore, 5 Cir., 263 F. 868; The Jean L. Somerville, 5 Cir., 286 F. 35, lending inferential support, we have taken a clear-cut position that where the salvage service performed is physically that of towage under circumstances which, in the hierarchy of values, characterizes the salvage of "low order," the salvor's compensation is limited to double towage only. Expanding this with an earnest force far exceeding the relatively small amount involved in the salvage award, the Owner's advocate asserts that if this is not so in fact, at least it is thought to be, the law upon which salvage cases are routinely adjusted without trial, and if it is the law, we should rescue it from the judicial limbo in which the District Court has left it, or plainly overrule it — the latter being, of course, a result which only the full Court en banc could reach.
 
 
 4
 But Catalina [105 F. 636], setting forth again by quotation from our earlier decision, The Rita, 5 Cir., 62 F. 761, the classic statement of the salvage factors, and criticizing the District Court's holding as one, "in the main disregarding the other elements of salvage, * * particularly the character and risk of the services actually rendered * * * "; and New Camelia [105 F. 640], decided the same day, with like exposition and criticism that the District Judge "* * ignored some of the important principles to be considered in every salvage allowance * * *", expressly stating that had the Owner of the salved tug been pressing the claim (asserted by a few crew members only) "* * * we could see our way clear to reward him for the services he controlled, and furnished with a suitable bonus in addition to the actual value of the services rendered * * *," cannot be read as though laying down the inexorable rule for double towage. Evaluating all of the factors — there the dominant ones of little or no risk and the physical simplicity of the services performed — the Court simply concluded that the equivalent of double towage would be adequate salvage compensation. Nor did citation of them in the Magnolia[1] case, Magnolia Petroleum Co. v. National Oil Transport Co. [286 F. 43] to support the holding that, "Double the towage rate, under the facts of this case, would be full compensation * * *," expand it into fiat. For moored safely alongside Catalina, made fast by semicolons fore and aft, was Colonel Moore and Jean L. Somerville, each of which involved substantial increases by us to assure that, whatever mechanical divisions there had been in setting forth the dollar values for particular parts, i. e., the towage at double rate, or the like, the total award would adequately compensate the salvor. And subsequent cases indicate quite clearly that in the review of salvage awards, The Connemara, 108 U.S. 352, 360, 2 S.Ct. 754, 27 L.Ed. 751, the award is not automatically to be reduced to time multiplied by twice the going towage rate. Standard Oil Co. v. Cooley, 5 Cir., 23 F.2d 841, 1928 AMC 586; The Egbert H., 5 Cir., 131 F.2d 111, 1942 AMC 1478.
 
 
 5
 Thus, we have not adopted the double towage rule, nor ought we. It would, first, put us in a class by ourselves, since no other Circuit in the wealth of jurisprudence[2] suggests any such artificial criteria. Moreover, the yearning for the rule is, of course, the quest for certainty — an unreal goal for, as Holmes tells us, "Certainty generally is illusion, and repose is not the destiny of man." When is it a case of simple towage service as a part of a low order salvage? What is it that changes the "simple" towage to something else? What does it become? What makes "low order" salvage into something higher? How much higher in rank does it have to be to invoke a new or different rule?
 
 
 6
 There is thus no certainty in the absolute proposed. It only aids when the crucial fact is determined — that the case is a simple one. But whether it is something less or something more must inevitably be left to the considered judgment of the judge. Since life's variables defy repetition, today's "low order" situation may present much different concerns than tomorrow's. The category itself is too elastic to think that once identified as such, the result or solution must be inflexible.[3]
 
 
 7
 While claiming, as the Trial Court found, that it was of a low order, the salved barge owner concedes that these were salvage[4] services and not towage,[5] as such.
 
 
 8
 The salved barge MV 603, worth approximately $60,000.00, 195 feet long, 35-foot beam, depth 11 feet, went adrift off of Petit Bois Island (south of Pascagoula, Mississippi) about 7:30 p.m., February 14. She was light, drawing perhaps two feet leaving nine feet of her hull plus the height of special hatch covers exposed to the wind. Twenty two hours later, 5:00 p. m., February 15, she was sighted 30 miles south of Mobile Bay which meant she had drifted approximately 35 miles to the southeast. Sixteen hours later, 9:00 a. m., February 16, she was sighted by a Coast Guard plane approximately 30 miles northeast of her previous position. This put her about 20 miles offshore. In a day and a half she had drifted in the neighborhood of 75 miles.
 
 
 9
 About this time, the Cherokee, a converted wooden hull, mine sweeper (YMS), valued at $50,000.00, then about 6 miles offshore and 14 miles southwest of Pensacola Light, towing two loaded sulphur barges eastward toward Tampa, spotted the barge. By radio exchange permission of the Cherokee's owner was given to the Master to use his judgment on salvage efforts. The Cherokee headed in toward shore, anchored her loaded barges, and then departed at 11:30 toward the derelict arriving at the MV 603 at 12:50 noon. MV 603 had in this interval of two to three hours drifted about 5 miles further northeast to a position approximately 17 miles southwest of Pensacola Light. She was just outside the sector marked "Danger Area (Chart 1265)" off the approach to Pensacola Bay and, had she kept on the course from her February 15 evening position — February 16 morning position — February 16 salvage position, she would have fetched up eventually on Santa Rosa Island approximately 17 miles away.
 
 
 10
 The sea was calm with running swells and a southwest wind of 18 to 20 MPH. As the Cherokee was rolling 15 to 20 degrees in the swells, it was necessary, she claimed, in order to avoid being crushed, to make three passes before she was able to put the Mate aboard MV 603 to take heaving and towing line. This tow got underway at 1:10 noon and delivered the barge at a Pensacola dock at 4:30. Departing Pensacola at 6:15, the Cherokee arrived back at her anchored barges at 8:45. The weather had increased considerably, but since there were Bargees aboard the sulphur barges, the tow made up without too much difficulty and got underway at 9:00 p. m.
 
 
 11
 Using a Pilot Chart[6] of the Central American Waters showing that the currents for this area set westward to west-southwestward and some testimony from a ready-made expert,[7] the barge owner argued that the barge MV 603 was not in peril since she would never have grounded on Santa Rosa. But the Court did not agree, and with ample record support. There was first the undeniable fact that MV 603, whatever Maury's teachings, had been headed northeast for 16 hours when sighted and there was a credible basis for finding that in the three hours between sighting and rescue, she had gained another five miles in that direction. Next, the course laid out by the Senator Bailey was North of East (84°) and despite a change of course to 119°, the tug was about seven miles offshore at the time she turned back. The District Judge could well have interpreted this action as indicating that the Senator Bailey anticipated that, when found, the MV 603 would be considerably to the North of her February 16 A.M. morning position.
 
 
 12
 But this didn't really matter. For a derelict barge, like a derelict person, may be exposed to many perils, the least of which is foundering on an obvious shoal. The MV 603 was at the gateway of a thriving port and whether headed towards Santa Rosa or by Maury's currents in the other direction, she was adrift at sea in the track of ocean-going vessels. Whether she went aground or was in collision, she was obviously in some danger,[8] exposed to real peril as the Barge's expert had to admit.[9]
 
 
 13
 Though it is not spectacular, and the only drama in the episode is perhaps the unknown race between Senator Bailey and Cherokee, the evidence is quite sufficient to justify the trial court's finding that the salvage efforts carried also an exposure to genuine risks and perils to the salvor. When attempting to come alongside the MV 603 to put a man aboard to take lines, there was a constant risk that as the two craft rolled and wallowed in the swells, the wooden hull or fragile plywood superstructure of the Cherokee would be damaged, and there was, of course, in this real hazard to personnel. Handling lines in the dark upon return to the anchored barges presented further hazard to craft and men. And, whatever her ultimate legal liability for loss or damage to the sulphur cargo on the anchored barges (see Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq. and Harter Act, 46 U.S. C.A. § 190 et seq.), the Cherokee was risking the goods of her customer and perhaps a business disadvantage if the goods were destroyed and the carrier defended on the salvage clause.
 
 
 14
 Salvage at sea may and often does call for the performance of exciting acts of great bravery to rescue lives or property from the jaws of a near and certain doom. But it need not, for the aim of salvage is to save. To aid before it is a do-or-die wager with high risks, high stakes, and high rewards, assures the greatest likelihood of recovery at the least peril. Maritime salvage is not reserved for hero alone. Its generous but judicious liberality is to encourage mariners instinctively to respond to need — be it great or small, drab or spectacular, certain in the knowledge that the scale of The Blackwall, 10 Wall. 1, 77 U.S. 1, 19 L.Ed. 870, provides the means to find a balance.
 
 
 15
 Free of any suggested arbitrary rule, and, on the contrary obligated properly to evaluate all of the factors, the District Court's allowance of a $3,000.00 award[10] withstands the scrutiny of our review. Standard Oil Co. v. Cooley, 5 Cir., 23 F.2d 841, supra; McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20, 1954 AMC 1999; C. J. Dick Towing Company v. The Leo, 5 Cir., 202 F.2d 850; The Connemara, supra.
 
 
 16
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The opinion in the District Court by Chief Judge Hutcheson, then District Judge, 281 F. 336, on the consequences of a greedy salvage contract, has attracted considerable attention, while ours has gone unnoticed. See 36 Harvard Law Review 489, Robinson on Admiralty, page 735; Cases & Materials on Admiralty, Morrison & Stumberg, 1954, page 438, footnote 1
 
 
 [2]
 See the note appended to The Lamington, 2 Cir., 86 F. 675, 685, listing substantially all salvage awards up to 1898; and also the Table of Salvage Cases appearing in each Five Year Digest of American Maritime Cases
 
 
 [3]
 Arbitrary rules cut both ways. At one time this salvage of a derelict barge would likely have given rise to an automatic salvage award of 50% of value. "The English once regarded it as obligatory to give such a share. In the Shreveport, D.C.E.D.S.C., 42 F.2d 524, 536, 1930 AMC 1310, however, the Court said: `I do not think the Moiety rule is a fixed rule of law, even in the case of technical derelicts", Robinson on Admiralty, page 745; and see footnote 2, page 423, Cases & Materials on Admiralty, Morrison & Stumberg, 1954
 
 
 [4]
 McConnochie v. Kerr, D.C.S.D.N.Y.1881, 9 F. 50, 53, "To constitute a salvage service it is `not necessary that the distress should be actual or immediate, or the danger imminent and absolute; it is sufficient if at the time the assistance is rendered the ship has encountered any damage or misfortune which might possibly expose her to destruction if the service were not rendered.' The Saragossa, [Fed. Cas.No.12,334] 1 Ben. 551, 553; The Charlotte, 3 W.Rob. 68, 71. So, if a vessel is `in a situation of actual apprehension, though not of actual danger.' The Raikes, 1 Hagg. 247; The Phantom, L.R. 1 Adm. 58; The Joseph C. Griggs, [Fed. Cas.No.6,640] 1 Ben. 81. And `the degree of danger,' says Dr. Lushington, `is immaterial in considering the nature of the service.' The Westminster, 1 W. Rob. 232." Robinson on Admiralty, page 718; footnote 1, page 389, Cases & Materials on Admiralty, Morrison & Stumberg
 
 
 [5]
 McConnochie v. Kerr, supra: "A towage service is one which is rendered for the mere purpose of expediting her voyage, without reference to any circumstances of danger. `Mere towage service,' says Dr. Lushington, (The Reward, 1 W.Rob. 177,) `is confined to vessels that have received no injury or damage; and mere towage reward is payable in those cases only where the vessel receiving the service is in the same condition she would ordinarily be in without having encountered any damages or accident.' * * * `It is the employment of one vessel to expedite the voyage of another.'"
 
 
 [6]
 U. S. Hydrographic Office No. 3500 states on its face: "Founded upon the researches made in the early part of the nineteenth century by Matthew Fontaine Maury, while serving as a lieutenant in the United States Navy."
 
 
 [7]
 This was the Master of the Tug Senator Bailey hired on February 16 on contract basis by the owners of MV 603 to pick up the barge in the Gulf at the February 16 A.M. position. While Cherokee's owners advised MV 603 owners prior to the departure of the Tug Bailey from the dock at Mobile, the message was not relayed, and the Senator Bailey got 20 miles east of Mobile Light before she was informed at 7:20 p. m. that the MV 603 was tucked safely away in her Pensacola berth
 
 
 [8]
 In evaluating risk of loss or damage to MV 603, we disregard the assertion that the tug Senator Bailey would have rescued her before she went aground or got in trouble. First, the salvor knew nothing of this and the likely peril is to be viewed through his eyes at the time he is determining whether to respond to the gallant call of the sea. Merritt & Chapman Derrick & Wrecking Co. v. United States, 274 U.S. 611, 47 S.Ct. 663, 71 L. Ed. 1232; The Cashemire, D.C.S.C., 38 F. 518; The Shreveport, D.C.S.D.S.C., 42 F.2d 524, 1930 AMC 1310. Second, Senator Bailey, at best, would not have arrived at MV 603's position until 9:00 p. m. The Master's Testimony may well have impressed the District Judge as it does us that, having only the February 16 morning position to go on, and actually heading way to the North of this, it was not at all clear how he expected to find the barge that night
 
 
 [9]
 Master Tug Senator Bailey: "Q. Suppose in your capacity as Marine Superintendent you had an expensive piece of equipment that you carried on your books at about Fifty-seven thousand dollars, would you think it part of prudent judgment to allow it to remain adrift in the Gulf under the conditions as you've described them for a period of more than two days? A. If I had that much money and a piece of machinery or anything else, I'd get it out of the Gulf as quick as I could * * * I'll go along with that. I'd get it inside."
 
 
 [10]
 The trial court might well have taken into account Cherokee's claim of damage to a towing hawser at a stipulated value of $805.71; if straight towage for 10 hours at $60.00 per hour, $600.00, is added the total $1405.75 leaves only $1600.00 as the inducement reward