THE Vessel JUDITH LEE ROSE, INC., et al.

v.

THE American Oil Screw Vessel CLIPPER.

No. 58–7.

United States District Court
D. Massachusetts.
Jan. 23, 1959.

Solomon Sandler, Gloucester, Mass., for plaintiff.

Myron Boluch, Boston, Mass., for defendant.

ALDRICH, District Judge.

On the afternoon of July 23, 1956, some 20 miles off the southwest coast of Newfoundland, the dragger Clipper, under the command of Captain Norte, while fishing alone, suffered damage to her clutch beyond her ability to repair. The sea was calm; there was no wind, and the weather, present and prospective, was good. The nearest repair facilities were at Corner Brook, Newfoundland. The Clipper established radio-telephone contact with a tow-boat there, who declined to come out except on a straight salvage basis. This meant "buying the boat back," as one witness put it, and Captain Norte refused. He then sought to request assistance of the libellant, the Judith Lee Rose, known to be in the vicinity. The Rose received the telephone message, but could not reply because of failure of her transmitter. The Clipper then made telephone contact with the Wave. Her captain, after obtaining clearance from his shore owners, stated that he would finish fishing that night, pick up the Clipper in the morning on his way home, and tow her to North Sydney. This was further than Norte wanted to go, and in the wrong direction, but not having raised the Rose, he accepted. All of these conversations were heard by the Rose. The Rose finished her day's fishing at 8 P.M. and proceeded to the Clipper, arriving at 11. The Clipper accepted her offer to tow her to Corner Brook, and cancelled her arrangement with the Wave.

The Rose was a sizeable dragger, five years old, and was stipulated for the purpose of this case only to be worth $190,-000. It was similarly stipulated that the Clipper, a smaller and older vessel, was worth $60,000. Because of her broken clutch the Clipper could not handle her wire, and the tow was accomplished by passing a line and using the Rose's. Estimates of the distance to Corner Brook vary between 80 and 100 miles. I do not think any party really knows, or that the exact distance is too important. The important fact is that the actual tow took about 12 hours, plus some time at each end.

The Rose remained at the dock about 10 hours. Her captain testified he was assisting the Clipper, but the only help he could specify was acting as an interpreter for Captain Norte, who was not long out of Portugal. During this period the Rose had her radio-telephone repaired, which, according to the itemized bill, required 3 hours' work. I cannot believe the services as interpreter, even if required, needed any more time. It was obviously of great importance to the

Rose to have her telephone put in order.[1] I find that the rest of her stay was simply for shore leave, and I charge none of this time to the Clipper. On the other hand, the 8 hours it took to get back to the fishing grounds are the Clipper's responsibility. This made a total of about one day.

The Clipper does not deny liability for a fair charge, but says that this should be limited to the Rose's time lost from fishing (which she computes in a very different manner from the Rose), plus any expenses. The Rose says that she is entitled to a low-grade salvage payment. It seems to me the Rose is entirely correct. The Clipper states she was in no danger. It is true, because of the favorable weather conditions, that she was in no immediate danger. But she would ultimately be in danger unless someone assisted her. This is demonstrated by the fact that the only commercial towing company available wanted full salvage rates. Thus the only alternatives were either the Rose or someone like her, or, ultimately, something far worse. This was a conventional salvage situation, and not towage.

Secondly, the Clipper says, and the Rose admits, that from time immemorial seamen, and perhaps particularly fishermen, customarily help each other in distress. From this the Clipper argues that the Rose would have charged only for towage, and would have made no salvage claim, if she had not known the Clipper was insured. It has been suggested that a salvor may decide, even after the event,

to make a claim. Costanzo Transportation Co. v. American Barge Line Co., D.C. W.D.Pa., 35 F.Supp. 929. I do not believe I would accept that. Where aid is offered, it should constitute either services or a gift ab initio. Here I find that the Rose intended from the start to be paid the full value of her services. Since it is a salvage situation, the burden is on the Clipper to show that they were accepted with a different understanding. The mere fact that pursuant to some custom the Rose might have rendered assistance without claiming salvage had the circumstances been different does not meet that burden. Cf. The Star, D.C. W.D.Wash., 53 F.2d 890.

■ The amount chargeable for salvage is always difficult to determine. There are a number of considerations, usually listed as the danger to the vessel receiving the services, and her value; the danger incurred by the salvors, and the value of their property; and the valor and skill of the salvors. The Emanuel Stavroudis, D.C.D.Md., 23 F.2d 214. Also to be considered are the expenses incurred by the salvors, including any loss due to detention,[2] The Angie & Florence, D.C.D.Mass., 77 F.Supp. 404, or excess depreciation. However, to enumerate the tests is not to provide the answer. It is commonly said that the basis of salvage is public policy—to encourage persons to undertake this needed service. The Blackwall, 10 Wall. 1, 77 U.S. 1, 19 L.Ed. 870; Mississippi Valley Barge Line Co. v. Indian Towing Co., 5 Cir., 232 F.2d 750. It seems to me this

1. Because in my opinion this has a bearing on the matter of salvage I will detail the testimony. In his answer to interrogatories before trial the captain of the Rose denied that any repair work was done to any of his vessel's equipment at Corner Brook. He must have known that this was not so. The broken telephone figured in this episode from the beginning. In his subsequent deposition he testified on cross-examination that the repair work on the telephone started half an hour after docking, and was completed half an hour after that. However, the bill he paid was for three hours. Also in cross-examination he was

asked whether having his telephone out of order would not make him "feel a little bit uncomfortable?" He replied "It would not." This testimonial conduct indicates a conscious attempt to rebut the very proper argument that to some extent the voyage to Corner Brook was to the Rose's advantage, and tends to increase in my mind the force of that argument.

2. For a discussion of demurrage when expenses are reduced, rather than increased, see Nicodemisen v. O/S/F/V Dartmouth, D.C.D.Mass., 157 F.Supp. 339.

principle might well act as an overall guide. What, in other words, would be the fair value of the services, and how much should this be increased by an anticipated salvage bonus as a reasonable inducement to persuade a person to undertake them? In computing this latter I disregard the fact that the servicing vessel might have been willing, because of some custom, to make a gift of her services. She was under no such obligation. On the other hand I do not disregard the circumstances that the Rose benefitted by having her telephone repaired at this juncture. Doubtless she would not have made a special trip of such length for this purpose, but this equipment is in constant use, and invaluable in case of trouble. So far as inducement is concerned the situation is somewhat comparable to towing a vessel to the place where the servicing vessel would have gone anyway, in which case any extra bonus for an uneventful tow might well be purely nominal.

The Rose's gross receipts for 1956, including what was paid to the crew, were $203,000. An examination of the settlement sheets does not show that this interruption occurred during an unusually profitable period of the year, and from the detention angle I think it would be fair to take a straight prorata basis. I reject the Rose's suggestion based on the value of the fish caught in the preceding eight hours as entirely speculative, as well as not taking into consideration other operative factors regarding the business as a whole. The prorata gross earnings for the year 1956 would be $560. To distinguish towage services from her customary occupation, particularly having in mind certain increased expenses due to the fact that this was all operating time, both from the standpoint of the vessel and the crew, it seems reasonable to double that figure. This is the minimum charge, to be increased by the various other pertinent factors.

No risk was involved here, and only routine work, on the part of the salvors. From the standpoint of inducement it seems to me important that there were other persons prepared to furnish assistance, and there was no immediate danger. On the other hand, no other vessel had been located who was willing to take the Clipper to the particular place she wanted to go. The Clipper was a vessel of some value. I think a fair salvage bonus under all circumstances would be an additional $500.

On the question of division between the Rose and the members of her crew, all are represented by the same counsel, and accordingly I will make no order in the absence of an agreement between the parties concerned. I find for libellants in the amount of $1,620, with interest from July 23, 1956.