**ANEPAC, LTD., Plaintiff**

**v.**

**BARGE "GREAT SOUND" Official No. 356237, Defendant**

Civil No. 1974-256

District Court of the Virgin Islands

Div. of St. Thomas and St. John

August 7, 1975

CHARLES S. WAGGONER, ESQ., *for libellant*

BAILEY, WOOD & ROSENBERG, ESQS., and HARTZELL, YDROCK, MELLARDS, SANTIAGO, PEREZ & NOVAS, ESQS. FRANCISCO G. BRUNO ROVIRA, of counsel), *for defendant*

YOUNG, *District Judge*

## MEMORANDUM OPINION AND JUDGMENT

### I

### BACKGROUND FACTS

Plaintiff Anepac, Ltd. ("Anepac"), a British Virgin Islands corporation, brings this admiralty action in rem for salvage against Cayman International Towing Co., Ltd. ("Cayman"), owner of the salvaged barge "Great Sound", registered in the Cayman Islands. In November, 1972, Cayman entered into a charter agreement with Caribbean Pacific, Ltd., whereby vessels belonging to the former would carry and deliver a cargo of sand to St. Croix. On November 12, 1972, the tug Chesapeake and the barges Great Sound and North Sound departed New Orleans for Ocean Key, Bahamas. They arrived at Ocean Key without mishap and picked up the cargo of sand. Between the Bahamas and the Virgin Islands, the tug Chesapeake experienced engine failure, the tug and barges separated, and the barges were set adrift.

Anepac became actively involved in the salvage of the aforementioned three vessels on or about November 28, 1972, when Dag Blidbeck, in a plane hired for the search and rescue operation, spotted the two barges drifting northeast of Auckland Island in a rough sea. One of the barges was in an upside down position, and the other had a slight list.

In furtherance of the salvage operation, a research vessel, the Neaptide, owned by Neaptide, Inc., and the tugs Delacroix and Oregon were contacted and dispatched to the area. Prior to embarking on the rescue of the vessels, the Oregon was equipped for communication purposes with a single side-band transceiver by Albert Cleland, an employee of Devcon, Inc. The tug Delacroix and Neaptide were the first to reach the barges; the Neaptide picking up the North Sound (the upside down barge) and the Delacroix towing the Great Sound, the tug Chesapeake and a small barge, the Dauphine. Delacroix left the Great Sound outside of Matthew's Town, Great Inagua, and then proceeded with the Chesapeake and Dauphine to San Juan. The mooring at Matthew's Town occurred on about the twelfth day of the salvage operation. Blidbeck testified that he made arrangements to have someone watch over the Great Sound at her anchorage in Great Inagua.

Approximately 24 hours after its arrival at Matthew's Town, the Great Sound broke loose from its moorings and was spotted sometime later drifting about 45 miles from its anchorage. Later that day, Mr. Blidbeck, continuing an aerial search, noted that the barge was moving farther south toward the Cuban coast. He then located the tug Oregon, captained by Gerald Jackson, and advised him of the approximate location and course of the Great Sound. At trial Mr. Blidbeck, with substantial yachting and sailing experience, noted that the seas during this stage of

131

the operation were rough. Approximately a day later, the Oregon made contact with the barge.

Captain Jackson's log reveals that his tug and crew became participants in the salvage on December 3rd, when they departed St. Thomas. Following fuel problems which required a stopover in Mayagüez, Puerto Rico, the 85-foot tug made contact with the Great Sound and arrived with the barge in Man-O-War Bay, Great Inagua on December 10th. After that vessel was securely moored, the Oregon contacted the Neaptide, received a transfer from that vessel of the barge North Sound and returned to Great Inagua on the late evening of the same day.

While at Great Inagua on the following day (December 11), Captain Jackson, at the request of Mr. Van Oosten, Managing Director of Cayman International Towing and owner of the barges, cut from the barges the damaged bulwarks which were trailing in the water. On December 14th, Jackson patched up holes in the deck of the Great Sound, pumped out the barge for about six hours, and moved her outside the reef to a safer anchor December 16, the Oregon departed Great Inagua with the Great Sound, pulled into Ponce, Puerto Rico, for fuel on December 21, then arrived in Christiansted, St. Croix, in the early morning of December 22nd. While docked at St. Croix, the sand was unloaded by employees of Masonry Products, the consignee of the cargo. In the early evening of December 23rd, the Oregon set tow for St. Thomas, arriving at its final destination with the Great Sound at 1:00 a.m. on December 24th.

## II

### LIABILITY

 In its post-trial brief to the Court, defendant barge Great Sound contends that the services performed by the plaintiff Anepac do not constitute salvage as defined by

law but rather fall within the definition of towage. This distinction is important only insofar as damages are concerned, for both salvage and towage services are compensable. Salvage, however, is generally compensated by a liberal award, while towage is compensated at regular towage rates. To create the status of a salvor, three elements need be present: a marine peril, voluntary service, and success in whole or in part. See Continental Ins. Co. v. Clayton Hardtop Skiff, 367 F.2d 230, 235 (3d Cir. 1966); Norris, Law of Seamen § 185, at 235 (3d ed. 1970). Towage service, on the other hand, is rendered for the mere purpose of expediting a vessel's voyage, without reference to any circumstances of danger or peril. See The Emanuel Stavroudis, 23 F.2d 214, 216 (D. Md. 1927). Therefore, the issue, which is clearly a factual one (see Waterman S.S. Corp. v. Shipowners & Merchants Towboat Co., 199 F.2d 600, 601 (9th Cir. 1952), cert. denied, 345 U.S. 941 (1953)), focuses on whether the element of peril was present in the instant case.

In deciding the issue the courts look to the situation that existed at the time the ship was taken in tow: If she was not under command, unable to navigate or to reach port unaided, the service will be considered salvage even though the ship was not in imminent danger of destruction and even though the towage itself was calm and uneventful.

Gilmore & Black, The Law of Admiralty § 8-2, at 446 (1957). See also Norris, supra at § 224 and the cases cited therein. Given this broad construction of the concept of a maritime peril, I have no difficulty in finding that the services performed by the plaintiff herein constituted a salvage. There is little doubt that the tug Chesapeake and the barges Great Sound and North Sound were unable to reach port unaided. Indeed, the defendant barge was drifting aimlessly after its towline to the Chesapeake broke, and a great deal of aerial reconnaissance was

required to even locate the Great Sound. Messrs. Blidbeck and Jackson, both experienced sailors, testified convincingly to the adverse condition of the seas surrounding the barge. Add to these circumstances the fact that the Great Sound was drifting in the direction of the Cuban coast, and the requirement of peril has been soundly met.

For, case law is clear that the danger need not be immediate or present. It is sufficient that there exists a state of difficulty and that danger is reasonably anticipated. See Mississippi Valley Barge Line Co. v. Indian Towing Co., 232 F.2d 750, 753 n. 4 (5th Cir. 1956). Moreover, the fact that the peril may be slight will not affect the nature of the salvage service, but rather will be considered by the Court in its determination of the amount of the award. See The Fannie Brown, 30 F. 215, 221 (D. Va. 1887).

In addition to the peril to the barge itself, the Great Sound, drifting as it was, created a potential hazard to other seagoing vessels in the area.

Defendant further asserts that plaintiff Anepac's relationship and special interest in the defendant vessel precludes it from becoming a voluntary salvor. The only conceivable relationship between plaintiff Anepac and the defendant barge alluded to at trial was an attempt by counsel for the defendant to establish that Kenneth Klein, the President and Director of Anepac, was also a principal in Carribbean Pacific, Ltd., the charterer of the Great Sound. Assuming, arguendo, that this relationship did exist, that fact certainly would not vitiate Anepac's status as a voluntary salvor.

The maxim that a person rendering a salvage service must be a volunteer only means that he must not have been under an existing duty to give such aid. See Spivak v. United States, 203 F.2d 881, 882 (3d Cir. 1953). Although the charterer of a vessel has an understandable interest in

134

the safety of that vessel, that interest is hardly the equivalent of the contractual or official obligation required to negate the element of voluntariness in the law of salvage.

<h1 style="text-align:center">III</h1>

## THE AWARD

■ The factors which an American judge must consider when he reaches that part of his opinion which deals with the amount of the salvage award were set forth by Justice Clifford in the oft quoted case of the Blackwall:

(1) The labor expended by the salvors in rendering the salvage service.

(2) The promptitude, skill and energy displayed in rendering the service and saving the property.

(3) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed.

(4) The risk incurred by the salvors in securing the property from the impending peril.

(5) The value of the property saved.

(6) The degree of danger from which the property was rescued.

77 U.S. (10 Wall.) 1, 14 (1869).

■ In order to put the above-mentioned factors into perspective, I must begin with the accepted premise that the valuation of the property salved is the most important criterion in deciding on the award to be made. See Gilmore & Black, supra at § 8-8. The only evidence in the record as to the value of the barge Great Sound was testimony by Mr. Klein that it had an insured value of $125,000.00; and that in negotiations for the purchase of the barge between Klein and Mr. Durant, President of Indian Towing Company, a value of $125,000.00 was discussed. From the starting point of $125,000.00, I must note that because one of the requisites of a salvage claim is success in saving property for the benefit of the owner, the award can never

be greater than the value of the salvaged property. Indeed, barring exceptional circumstances, an award of anywhere near fifty percent (50%) is considered extremely high. See Gilmore & Black, supra at § 8-10.

Turning from a determination of what might be considered the *upper limit* of the award in this case, I must further acknowledge the fundamental principle that compensation for salvage services is not determined on a strict quantum meruit basis or as remuneration pro opere et labore, but as a reward for perilous services voluntarily rendered. Salvors, in other words, are to be paid a bonus according to the merit of their services. A proper salvage award, then, falls somewhere between half the value of the salved vessel ($62,500.00) and the reasonable value of the services rendered.

Admitted into evidence at trial were two invoices from All-Island Air Taxi, for the rental of a Piper Apache airplane used in the salvage operation. These rental costs, computed at the rate of $75.00 per hour, total $2,400.00. Another invoice sent to Anepac represented the charter of an Aztec airplane (Triple 3 Yankee), owned by Ken Klein, Inc., and valued at $45,000.00, used in the search and rescue operation. The bill was for $19,800.00. That amount, excessive on its face, was calculated at $75.00 per hour, on a twenty-four (24) hour a day basis (apparently because it was constantly "on call" in Great Inagua during this time). Mr. Klein further noted that two days were calculated at triple-rate, for the hazard of flying over the Cuban coast and for the several times the plane went beyond its range with limited fuel. Mr. Klein urged the Court at trial that his bill (to himself, essentially) was reasonable because his hourly rate comported with that of Mr. Chapman at All-Island Air Taxi. It is clear, however, from Chapman's invoice that he did not charge on a twenty-four (24) hour basis. Furthermore, to permit

triple recovery for a pilot's temerity in traveling with insufficient fuel would be to allow plaintiff to profit from that carelessness. I find that $10,000.00 is a more reasonable charge for the plane's services.

Also in evidence is an invoice from Zinke-Smith, in the amount of $2,887.00 for the installation of electronic equipment on the tug Oregon. The Neaptide, a $200,000.00 research vessel also owned by Ken Klein and involved with the barge Great Sound for a twenty-four (24) hour period in Bahamian waters, was chartered at the rate of $1,500.00 per day.[1] The tug Oregon, chartered at a $1,000.00 a day rate, was involved in the operation from December 4 to December 24, 1972, totalling a fee for services of $20,000.00.

Defendant in its post-trial memorandum raises some interesting issues concerning the foregoing claimed sums. These expenses were unequivocally incurred as a result of the entire salvage operation. This Court has received in evidence testimony to the effect that the barge North Sound and the tug Chesapeake were also subjects of the salvage operation. It is thus necessary to segregate the expenses incurred by the plaintiff in relation to its salvage of the Great Sound only. From the totality of evidence presented at trial, it appears that, at least with respect to the time and effort expended, the salvage of the Great Sound accounted for approximately half of the total search and rescue operation. It thus follows that of the sums heretofore noted, only fifty percent can be deemed attributable to the defendant barge. What remains, then, are the following amounts:

---

[1] To further substantiate this Court's reduction of the $19,800.00 charter fee on the Aztec owned by Ken Klein, Inc., it should be noted that the airplane, valued at $45,000.00, was chartered at the rate of $1,800.00 per day (twenty-four (24) hours at $75.00 per hour), while the $200,000.00 Neaptide was chartered for only $1,500.00 per day.

137

| | |
|---|---:|
| Air-Island Air Taxi Rental | $1,200.00 |
| Rental of Aztec (Ken Klein, Inc.) | 5,000.00 |
| Installation of electric equipment (Zinke-Smith) | 1,443.50 |
| Charter Tug Oregon | 10,000.00 |
| Charter Neaptide | 1,500.00 |
| Total | $19,143.50 |

Were the Court obliged to proceed on a strictly quantum meruit basis, this $19,143.50 figure would be the Court's award. However, as suggested previously, the salvor is entitled to a bonus, dependent essentially on what has been termed the "moral aspects" of the salvage service. These aspects include, inter alia,

the promptness with which the service was rendered, the time consumed in completing the salvage, the degree of skill or ingenuity required or manifested, the extent of danger from which the salved property was rescued, the peril which attended the work of the salvors . . . .

Gilmore & Black, supra at § 8-9.

 Having evaluated the instant salvage operation in light of these criteria, I find that the salvage service was of "low order". Although the danger from which the Great Sound was extricated was sufficient to place the operation firmly within the definition of salvage rather than towing, it was little more than that. Several barges floating freely in the ocean currents create a danger which is manifestly more potential than actual. Although the overall performance of the salvors was quite skillful, I am reminded by defendant in its post-trial brief that the salvage services were extended from December 5 to December 9, 1972, primarily because the Great Sound broke from its anchor in Matthew's Town and went adrift. This extension of the salvage operation can reasonably be

attributed to salvor's negligence in failing to leave the salved vessel properly secured. Although I decline to reduce plaintiff's award because of this failure (and because no damages as a result of this negligence were proved), I find that it tends to justify a "low order" award.

■ Having decided upon a "low order" of salvage as a standard, the question arises as to what extent the actual expenses of the plaintiff ($19,143.50) should be increased to arrive at a final award. An award of double the amount of expenses incurred by plaintiff appears to be in line with the cases using a "low order" standard of salvage. See Mississippi Valley Barge Line Co. v. Indian Towing Co., 232 F.2d 750, 577 n. 10 (5th Cir. 1956); see also the cases cited in Gilmore & Black, supra, § 8-10, at 467 n. 99.

Defendant finally contends that the charter fee owed by Caribbean Pacific, Ltd., to the owners of the barge Great Sound should be offset from the salvage award granted by this Court. This contention is predicated on the theory that Caribbean Pacific, Ltd. and Anepac, Ltd., are one and the same interest belonging to Ken Klein. This claim fails for lack of proof. On plaintiff's side, the Court has a flat denial by Mr. Klein that he was in any way associated with Caribbean Pacific, Ltd., at the time the charter arrangement was entered into with Cayman International Towing Company. Defendant, on the other hand, presented testimony by both Mr. Van Oosten and Mr. Durant that not only was Mr. Klein the dominant force behind Carribean Pacific but he was present when the charter agreement was signed. Even assuming that Mr. Klein was present at the signing,[2] that fact alone does not persuade me of his

---

[2] It may be of no more than footnote significance, but I do specially find, on basis of credibility, that Mr. Klein was not present at the time and place of the execution of the charter agreement.

leadership of Caribbean Pacific or of the unity of Caribbean and Anepac. The setoff, therefore, will be denied.

### JUDGMENT

In accordance with the foregoing Memorandum Opinion and the reasons set forth therein, it is hereby

ORDERED ADJUDGED and DECREED:

That plaintiff Anepac, Ltd., be paid by Cayman International Towing Company, owner of the defendant barge Great Sound, the sum of $38,287.00, plus indemnification for costs in the amount of $1,535.10. No attorneys' fees will be awarded under 5 V.I.C. § 541(b) due to the inherently federal nature of this action and the absence of any authority for the granting of such fees in admiralty actions.