Barry CLIFFORD, Plaintiff,

v.

M/V ISLANDER and Woods Hole, Martha's Vineyard and Nantucket Steamship Authority, Defendants.

Civ. A. No. 80–2160–N.

United States District Court,
D. Massachusetts.

June 14, 1983.

Robert S. Wolfe, Wolfe & Associates, Boston, Mass., Allan H. Tufankjian, Brockton, Mass., for plaintiff.

Frank H. Handy, Jr., Kneeland, Kydd & Handy, Boston, Mass., for defendants.

DAVID S. NELSON, District Judge.

The plaintiff, Barry Clifford, has filed this cause of action against M/V Islander and its owner, the Woods Hole, Martha's Vineyard and Nantucket Steamship Authority (hereinafter "SSA"). Jurisdiction is predicated upon 28 U.S.C. § 1333. Section 1333 provides, *inter alia:*

> The district courts shall have original jurisdiction exclusive of the courts of the states, of: (1) Any civil case of admiralty or maritime jurisdiction. . . ."

The plaintiff avers that he is entitled to a salvage award for services which he rendered to the defendant's vessel. Alternatively, he prays that the court will find a special contract for the reasonable value of his services. The defendants have filed an answer and posted a one million dollar letter of undertaking. Though the defendants admit that Barry Clifford is a professional salvor and assisted in the repair of their vessel on March 19, 1980 through March 20, 1980, they emphatically deny that he rendered salvage services which eliminated a maritime peril. However, the defendants concede that Barry Clifford is owed some reasonable compensation for the services performed by him.

After trial by this court, and a painstakingly thorough review of the evidence, I am obliged to conclude that no legally cognizable act of salvage was performed by the plaintiff. The plaintiff has failed to prove, by a preponderance of the evidence, a salvage contract or an act of pure salvage. Nevertheless, the court finds that the plaintiff has proved a special maritime contract. Thus, the plaintiff is due remuneration *pro opere et labore.* The court awards the plaintiff $150,000 as the reasonable value of his services. The plaintiff's motion for attorney's fees is hereby denied.

I *Findings of Fact*

1. The M/V Islander was launched on or about April 29, 1950. It was 201 feet with a 60 foot beam at the main deck. It had a six foot freeboard at the low point of the sheer. The draft below the water line was approximately ten feet. It was designed as a double-ended ferry and built by the Maryland Drydock Company. It was originally powered by a 1600 horsepower engine which was connected by a direct drive to two propellers—one at each end of the vessel. The vessel was overhauled in 1965 and new engines were installed. The new draft was 10′ 3″ at the bow and 9′ 10⅞″ at the stern.

2. The SSA owned and operated this vessel in 1980. The vessel was often used to transport passengers and cargo between Woods Hole and the Island of Martha's Vineyard. During the winter months, the SSA would customarily close the Oak Bluffs' ferry terminal on Martha's Vineyard and use the sheltered Vineyard Haven terminal on the Island.

3. The terminal consisted of a long pier constructed on top of wooden pilings or "dolphins." Vessels docking at the terminal would simply enter a corridor created by several dolphins running parallel to the pier. The pier did not extend a great distance from dry land, and the bottom below the terminal sloped away from the land. At the front of the slip where the bow of the ferries are secured, the depth was no more than 12 feet at low tide; typically, the tide ranged up to 3½ feet.

4. When wind, waves and currents came from the north, south and/or east, the only things preventing a vessel moored to the terminal from being driven aground were the lines securing the vessel at the pier and the three "clusters" of pilings to the starboard of the vessel.

5. In March of 1980, the SSA desired to do some construction and maintenance at the Vineyard Haven terminal to give Islanders better service. These activities ne-

cessitated the closure of the Vineyard Haven terminal and the temporary re-opening of the Oak Bluffs' terminal.

6. At 8:15 a.m. on March 19, 1980, the M/V Islander left Woods Hole for the Oak Bluffs' terminal. The vessel arrived at Oak Bluffs at 8:59 a.m. and off-loaded ninety-six passengers with cargo. There were Force 3 winds from the Northwest with a current running to the east at 1.4 to 1.8 knots.

7. At 9:18 a.m., the M/V Islander departed the Oak Bluffs' terminal with 130 passengers, 45 cars and six trucks.

8. At 9:20 a.m., the M/V Islander struck a rock submerged 11.5 feet, approximately 700 feet from the Oak Bluffs' terminal. When the vessel struck, the engineer in the engine room felt a "severe rumbling." Water flooded compartments # 3 and # 2; water also leaked into the engine room. (It was later learned that the vessel had been holed along an 18 foot section of its hull).

9. The Captain did not know the extent of the damage and elected to turn the vessel around and return to Oak Bluffs. He radioed the ticket agent to get pumps and handlers to the terminal.

10. When the vessel reached the terminal, its stern was drawing only eight feet. As a result of the loss of forward buoyancy, the rudder and propeller in the stern were exposed and the vessel lost its ability to steer. The vessel proceeded to crash into the easterly end of the slip and fracture approximately 21 of the 55 pilings comprising the dolphin holding up the end of the pier.

11. The vessel was ultimately secured at approximately 9:40 a.m., and a ramp was constructed to reach the ferry now sunk below its usual height in the slip. All passengers and all cargo, save one truck, were unloaded. The Captain believed that there was approximately one foot of water between the keel and the bottom of the slip at the bow.

12. At approximately 9:42 a.m., fire trucks arrived and began to assist the SSA in controlling the flooding of the compartments. The fire trucks used pumps with a total combined capacity of 1750 gallons per minute. These pumps together with the vessel's pumps were unable to pump the compartments dry. However, the water level had stabilized and the Islander was in no danger of losing buoyancy.

13. The Captain of the vessel did not want to move the vessel for repairs until the vessel was temporarily patched.

14. Ken Fardie, a skin diver, appeared at approximately 10:40 a.m. The Coast Guard called Wayne Iacono (a trained diver) at 11:00 a.m. and asked him to go to the vessel. Iacono went and met Harold Brackett (the maintenance and construction manager of the SSA) at the terminal. Brackett told Iacono "we can use all the help we can get" and directed Iacono to "suit up." Brackett did not give Iacono any further instructions.

15. Iacono then met Mr. Stephen Broderick, the engineer for the SSA. Broderick saw that Fardie and the other divers were tired and Broderick took "command" of the situation. He told the other divers to get out of the water and instructed Iacono: "Go ahead, you dive, and you send the bill to the Steamship Authority."

16. Broderick then requested that Iacono survey the vessel, measure the holes, and tell him the location of the holes. Broderick was concerned that the holes might be "dangerously close to the rudder post compartment. [The holes were] dangerously close to the engine room aft...." At this point, the divers had tried using mattresses and traffic cones to stem the flow of water. These measures were ineffective.

17. At approximately 11:30 a.m., the wife of Barry Clifford received a call from the SSA requesting the plaintiff to "come down with his equipment." Barry Clifford was contacted by his wife. He immediately left work, returned home to get his diving equipment and went to Oak Bluffs.

18. Barry Clifford was born on May 20, 1945. He had a life expectancy of approximately 37.7 years.

19. The equipment that Clifford took with him included the most advanced dry

suit and diving equipment available. The other divers working at the site had only conventional wet suits. Because the water temperature at Oak Bluffs was only 35.4°F, divers using wet suits were unable to remain submerged for prolonged periods without extreme discomfiture and fatigue. Fatigue, in turn, caused divers to consume air more quickly. It also enhanced the possibility that the diver might be injured.

20. Indisputably, Clifford's experience as a diver and salvor was unique. He had to his credit the discovery of lost revolutionary war and pirate ship wrecks; the recovery of cargo from ships that had sunk in the 1800's; and in hundreds of instances, the recovery of objects of contemporary origin. He had read extensively literature relating to salvage and salvage techniques. He had worked as a diver for two salvors and had performed professional salvage services in his own right. His regular income was derived from various business ventures, several related to construction and salvage. Over the years, he had dived hundreds of times in New England waters.

21. When Clifford arrived, he first met Steve Broderick and Tom Cuniff, the engineer for the Islander. The plaintiff, subsequent to volunteering his services, was then taken to meet Harold Brackett, the SSA manager of maintenance and construction. Brackett was identified as being in charge of the operation. In the course of the conversation, Ronald Eastman, the assistant General Manager of the SSA, joined the group along with William Marks, an official from Martha's Vineyard. The plaintiff asked about the vessel design and condition. He was given a general description of the vessel; no one knew the extent or location of the damage. There were two inexperienced divers already at the site. Those divers "stuffed" traffic cones in the holes; the cones did not stop the water. Clifford said that he would first have to look at the vessel underwater to see the damage; thereafter, he could recommend repairs.

22. The plaintiff put on his equipment and met with the two young men who had been diving. The young men could generally describe the damage.

23. Clifford dove into the water alone at approximately 12:00 noon. He noted the water was frigid and that the tide was running to the North. There was poor visibility due to the presence of silt, and there were no safety lines strung to protect the diver. Clifford proceeded to assess the damage. Records indicate that the wind was blowing at Force 3 from the Northwest. The current was running at 130° at 1.4 knots to 1.8 knots. The water temperature was 35.4°F.

24. Clifford observed four holes on the starboard side beginning approximately 50 feet from the bow. He observed in the center of the bottom of the vessel a crack running approximately 60 feet. He left the water at 12:15 p.m. and reported his observations to Brackett, Eastman and Cuniff.

25. Steven Broderick hired Clifford as a diver to aid in the repair of the vessel. Clifford was specifically informed that he was being hired on a daily basis, and that he should submit a bill to the Steamship Authority.

26. The plaintiff proceeded to draw up a 4 phase plan by which the holes in the vessel would be temporarily patched.

27. *Phase 1* consisted of stretching a tarp over the holes; each corner of the square tarp would be secured by a rope with two ropes going up each side of the vessel to be tied off by deck hands. It was believed that the force of the water coming up through the holes in the hull would hold the tarp in place.

28. Clifford recommended that he and two other divers, Ken Fardie and Wayne Iacono, swim the tarp under the vessel to put it in place. They would have to run safety lines for the protection of all divers. All traffic cones and other material stuffed in the holes of the hull would have to be removed prior to the installation of the tarp.

29. *Phase 2* required the installation of four two feet by two feet patches on the outside of the vessel in the location of the

holes. This would necessitate cutting the plywood into two feet by two feet squares. Six inches of foam would be secured to one side of the plywood patches to enhance the water tightness of the seal. A line would be drawn through the middle of each patch and secured to the outside surface of the patch. The other end of the lines would be threaded through the tarp using a knife attached to a pole. A diver located inside the flooded compartments would pull on each rope causing each patch to become snug to the exterior of the vessel. The ropes would then be tied off in the interior. Inasmuch as it appeared that at least two compartments of the vessel were flooded, separate dives would have to be made in each compartment. More probable than not, a separate dive would have to be made for the placement of each patch. It was intended that after the completion of phase 2, the vessel and fire trucks in place would be able to successfully remove most, if not all the water, in the flooding compartments. *Phase 3* would then be instituted.

30. *Phase 3* consisted of applying plywood patches between the frames of the vessel on the interior of each compartment in the location of the holes. These patches would be secured between the frames with four by fours cut to fit.

31. *Phase 4* involved the installation of temporary steel plates welded to the inside of the vessel.

32. After the presentation by Clifford of the salvage plan, Tom Cuniff recommended its adoption to Harold Brackett and Ronald Eastman. Cuniff said that Clifford was competent and that Cuniff trusted Clifford's judgment.

33. With great courage and skill, the 4 phase plan was completed by Clifford and others under the direction and command of the Steamship Authority through Ronald Eastman, Harold Brackett and Steven Broderick. Though Clifford created the plan for the ship's repair, he was at no time in charge of the repair operation from March 19, 1980 to March 20, 1980.

34. The seas at Oak Bluffs were at all times calm during the performance of repair work on March 19, 1980 and March 20, 1980.

35. On March 21, 1980 at 12:50 a.m., the vessel departed for Woods Hole. Ultimately, the vessel was permanently repaired by Bethlehem Steel Corporation in Boston, Massachusetts. The cost of permanent repairs was $450,000.

36. When the vessel sailed for Boston, it was worth $2,500,000.

II  *Conclusions of Law*

All of the credible evidence leads me to the ineluctable conclusion that the plaintiff, Barry Clifford, performed no act of pure salvage, nor has he proved the existence of a salvage contract. Though Congress has established perimeters for recovery in certain types of salvage claims, general maritime law is the principal source of law in determining the rights and remedies of a salvor. *See generally,* 46 U.S.C. § 721 *et seq.* (1970); *see generally,* 3A Benedict on Admiralty: The Law of Salvage (ed. M.J. Noriss 1980). There are three required elements of proof to establish a valid salvage claim:

"(a) a marine peril; (b) service voluntarily rendered when not required as an existing duty or from a special contract; (c) success in whole or in part or that the service rendered contributed to such success." *The Sabine,* 101 U.S. 384, 25 L.Ed. 982 (1819). *See also* Noriss, *supra* at 24.[1]

The law mandates that the peril or danger to which the vessel was exposed be actual or reasonably apprehended at the time the services were provided by the salvor. In *The Phantom,* Dr. Lushington commented:

"It is not necessary that the distress should be actual or imminent or absolute,

1. Black and Gilmore write:
[T]here must be a maritime peril from which the ship or other property could not have been secured without the salvor's assistance. The salvor's act must be under no official or legal duty to render assistance. The act must be successful in saving, as in helping to save, at least a part of the property at risk. Black and Gilmore, The Law of Admiralty, 534–5 (1975).

but it is sufficient if, at the time the assistance is rendered the vessel has encountered any damage or misfortune which might possibly expose her to destruction if the services were not rendered."[2]

■ In the instant case, the plaintiff has failed to prove, by a preponderance of the evidence, the existence of a maritime peril which endangered the vessel. The evidence presented at trial indubitably evinces the capacity of the ship to be moved under its own power without temporary repairs. Witnesses for the defense testified that the ship was at no time in danger of sinking; that the water level in the compartments had stabilized; and that the engine room was never flooded. The Captain testified that the ship could have been easily operated without the temporary patchwork done by Clifford and others. The plaintiff directs the court's attention to a line of cases which stand for the proposition that "flawless hindsight" analysis as to the need for the salvor's assistance will not be allowed to deprive a salvor of his just desserts. Defendants will not be heard to say that they were not in peril after they have requested and accepted the salvor's services. The *Nicholas* court held:

> Now when flawless hindsight has resolved the uncertainties of the moment, respondent will not be heard to claim that it was neither necessary nor beneficial to use libellant's help. *Nicholas E. Venicos Shipping Co. v. United States,* 223 F.Supp. 116 (S.D.N.Y.1963).

The plaintiff's recitation of the law is accurate. Unfortunately, no credible evidence was proffered at trial which supported the existence of a maritime peril—actual or apprehended. When the plaintiff arrived on the scene, a number of individuals were engaged in attempts to repair the ship and remove water from it. The plaintiff joined the enterprise. He now, as a professional salvor, attempts to utilize his superior knowledge of the law of admiralty to create a legitimate salvage claim. Furthermore, contrary to the testimony of the plaintiff and William Marks, Ronald Eastman of the Steamship Authority testified that the word "salvage" and the phrase "no cure, no pay" were never used in conversations with Barry Clifford. Eastman testified, as did other defense witnesses, that the boat was not sinking, nor was such a statement made to Barry Clifford. The members of the M/V Islander were at all times on duty; there was simply no fear of the boat being lost. A week after the repair operation, Barry Clifford went to the office of Eastman and inquired as to the value of the M/V Islander. Clifford mentioned a salvage claim and Eastman informed him that the Steamship Authority was prepared to pay him the reasonable value of his services. Consequently, no pure act of salvage occurred.

■ Too, the plaintiff failed to prove an oral or written salvage contract. It is blackletter law that a salvage contract exists only if there is an agreement as to the amount of compensation. The contract may be consummated pursuant to a written or oral agreement. In *Lago Oil & Transport Co. v. United States,* 218 F.2d 631, 634 (2d Cir.1955), Justice Frankfurter cites the *Camanche* 75 U.S. (8 Wall) 448, 19 L.Ed. 397 (1869). The *Camanche* announced the following rule:

> "[T]he rule is that nothing short of a contract to pay a given sum for the service to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise will operate as a bar to a meritorious claim for salvage.[3]

Barry Clifford has failed to carry the burden of proof showing a salvage contract or

---

2. *See The Saragossa,* Fed.Cas. 12, 334 (S.D.N. Y.1867); *see also Lambros Seaplane Base, Inc. v. The Batory,* 215 F.2d 228 (2nd Cir.1954); *Sears v. S.S. American Producer,* 1972 A.M.C. 1697 (D.C.Cal.1972); *Ft. Myers Shell & Dredging Co. v. Barge N.B.C. 512,* 404 F.2d 137 (5th Cir.1968); *Sobonis v. Steam Tanker Nat. Defender,* 298 F.Supp. 631 (S.D.N.Y.1969). *The Phantom,* LR 1 Adm. & Eccl. 58 (Eng.1866); *Cf.*

*Mississippi Valley Barge Line Co. v. Indian Towing Co.,* 232 F.2d 750, 1956 AMC 757 (CA5 La.1956); *The Judith Lee Rose, Inc. v. The Clipper,* 169 F.Supp. 885, 1959 AMC 523 (D.C. Mass.1959).

3. *See Paumier v. Barge BT 1973,* 395 F.Supp. 1019, 1037 (E.D.Va.1974); Black and Gilmore, *supra* at 584; Noriss, *supra* at §§ 12–1, 12–2.

a pure act of salvage. His failure to sustain the first prong of the three-pronged salvage test is fatally dispositive of his claim.

■ Though the plaintiff's attempt to prove a salvage claim has failed, the plaintiff has proved the consummation of an oral maritime contract for the repair of the vessel. The defendants do not deny that they agreed to accept the plaintiff's services and to pay him the reasonable value therefor. Both Broderick and Eastman testified that the Steamship Authority was prepared to remunerate Clifford for those services rendered by him. Accordingly, I find that a preponderance of the credible evidence proves the existence of a binding contractual agreement.

The validity of oral maritime contracts is a rule of ancient respectability at admiralty. *See Kossick v. United Trust,* 365 U.S. 731, 81 S.Ct. 886, 889–890, 6 L.Ed.2d 56 (1961); *Pierside Terminal Operators, Inc. v. M/V Floridian,* 423 F.Supp. 962, 963, 967–969 (E.D.Va.1976); *Selame Assoc., Inc. v. Holiday Inns, Inc.,* 451 F.Supp. 412, 418 (D.Mass.1961); *Hellenic Lines Limited v. Gulf Oil Corp.,* 340 F.2d 398, 402 (2nd Cir. 1965).[4] There is no question that the contract, at bar, is maritime. A maritime contract is one which "relates to ships and vessels, masters and mariners." *See* 1 U.S.C. § 3; *The Showboat,* 47 F.2d 286 (D.Mass.1930); *Miami River Boat Yd., Inc. v. 60' Houseboat,* 390 F.2d 596 (5th Cir. 1969); *Kilb v. Menke,* 121 F.2d 1013 (5th Cir.1941); *United States v. Bethlehem Steel Co.,* 53 CCPA 142 (1966), *cert. denied,* 386 U.S. 912, 87 S.Ct. 865, 17 L.Ed.2d 786 (1967); *Vancor Steamship Corp. v. United States,* 406 F.Supp. 810 (Cust.Ct.1976). "If the contract relates to a ship in its use as

such or to commerce in navigable waters, such a contract is the subject of maritime law and the case is within admiralty jurisdiction whether the performance of the contract is to occur on land or at sea. *Pierside, supra,* 423 F.Supp. at 967; *Martran Steamship Co. v. Aegean Tankers, Ltd.,* 170 F.Supp. 477, 478 (S.D.N.Y.1959) *citing Compania Argentina De Navegacion Dodero v. Atlas Maritime Corp.,* 144 F.Supp. 13 (S.D. N.Y.1956). Hence, the request for Clifford's assistance, his subsequent acceptance of the offer to aid in the vessel's repair, and his performance of vital services for the benefit of the ship constitute a legally cognizable contract. Clifford agreed that he would "put in a bill" for the work and the sanctity of this agreement must not be violated by this court. The agreement must be enforced in accordance with its terms and conditions. There was equal bargaining power on the part of the parties to this dispute; no party acted unconscionably. I am therefore constrained to enforce the agreement. As the defendants concede in their memorandum of law (dated February 22, 1983): Where there is a valid contract between the parties, the courts will not normally interfere with such an agreement. *The Elfrida,* 172 U.S. 186, 19 S.Ct. 146, 43 L.Ed. 413 (1898) (case involved a salvage contract); *see also* Perillo and Calamari, Contracts, §§ 1–3, 1–4 (1977).

Predicated upon the findings of fact and the legal analysis in this opinion, I find for the plaintiff, Barry Clifford. Judgment shall be entered in accordance with this opinion. Be It SO ORDERED.

---

4. Oral maritime contracts are a part of the law of admiralty by force of custom. Thus, the Statute of Frauds has no application to them. The legality of this species of contract has not often been the subject of litigation. *See Union Fish Co. v. Erickson,* 248 U.S. 308, 39 S.Ct. 112, 63 L.Ed. 261 (1919); *U.S. F Fidelity & Guaranty Co. v. American-Hawaiian S.S. Co.,* 280 F. 1023 (4th Cir.1922); *Hastorf v. F.R. Long-W.G. Broadhurst Co.,* 239 F. 852 (1917); *Quirk v. Clinton,* 20 Fed.Cas. 146, No. 11,518; *Northern*

*Star S.S. Co. of Canada v. Kansas Milling Co.,* 75 F.Supp. 534 (S.D.N.Y.1947). *See also* Hough, *Admiralty Jurisdiction of Late Years,* 37 *Harv.L.Rev.,* 529, 537 (1924); *Soc. Portuguesa de Navios Tanques, Ltd. v. Hvalfslsk Polaris A/S,* [1952] 1 Lloyd's List Reports 73, 74 (per McNair, J.) (in which opinion he is confirmed by Kent, 3 Commentaries 159–160 (1828 ed.)); Pothier, Maritime Contracts 10 (Cushing trans. 1850).